[No. B124811. Second Dist., Div. Five. July 29, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
QUINCEY LEE MOSLEY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.B. and III.C. of the Discussion.

COUNSEL

Raymond L. Girard, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson and William T. Harter, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WEISMAN, J.*—

## I. INTRODUCTION

Defendant Quincey Lee Mosley appeals from a judgment of conviction following a jury trial in which he was convicted of murder in the first degree of Lonnie Roberson (Pen. Code[1], § 187, subd. (a).) The jury found not true special allegations that a principal was armed with a firearm (§ 12022, subd. (a)(1)), that defendant personally used a firearm (§ 12022.5, subd. (a)), and that defendant inflicted death on Lonnie Roberson by discharging a firearm from a motor vehicle (§ 12022.55). Defendant was sentenced to state prison for a term of 25 years to life. Defendant contends on appeal: (1) the trial court erred when it ruled his statements to the police in an ambulance were admissible despite the lack of any *Miranda* advisements or waivers; (2) the trial court erred when it admitted evidence of defendant's gang membership; and (3) the evidence is insufficient to support his conviction of first degree murder as an aider and abettor. We reject defendant's contentions and affirm the judgment.

## II. FACTUAL SUMMARY[2]

Lonnie Roberson and Ted Theus were among a group of people standing outside Aikin's Market around 5:30 p.m. on December 14, 1996. Aikin's Market was located in Lynwood at 12601 Harris Avenue, which was on the corner of Harris and Olanda. At that time there were about seven to nine

---

*Judge of the Municipal Court for the Los Angeles Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]In accord with the usual rules on appeal, we state the facts in the manner most favorable to the judgment. (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

people standing outside of the market, including Ted Theus and Lonnie Roberson. Aikin's Market is a place where Mob Piru gang members gathered, although neither Ted Theus nor Lonnie Roberson was a gang member. The Mob Piru gang claimed that territory, but there were other gangs in the general neighborhood, including the Palm and Oak gang.

Lonnie Roberson spoke to Ted Theus for a while, and then said that he should be going, since a person could get shot standing at that location. Lonnie Roberson then started to walk around a black car that was parked in front of the market. At that time a white or tan car that looked like a Buick Cutlass was parked outside of the store. The car stopped on the wrong side of the street in front of the market. A number of shots were fired from the car and Lonnie Roberson and Ted Theus were both hit by gunfire. Ted Theus was hit in the ankle and in the upper inner thigh area. He survived his wounds and was later treated by paramedics. Lonnie Roberson was hit 11 times and died from his wounds. The fatal wound was from a bullet that penetrated his back and entered his chest, where it injured a lung and caused severe bleeding. The other 10 wounds were mainly in the lower extremities. The bullet that caused the fatal wound was recovered during an autopsy. Ted Theus was not sure, but he estimated about 50 shots were fired. In addition to the shots that hit Ted Theus and Lonnie Roberson, shots were "flying around" and ricocheting inside Aikin's Market. When the shooting started, about five or six people ran into Aikin's Market. The cashier inside the market was able to see that shots were coming from the white car in front of the store. When the white car left the area, a black car that had been parked in front of the market pulled out and drove off in a hurry.

Los Angeles County Deputy Sheriff David Holwager responded to Aikin's Market in response to the shooting. When he arrived he observed Lonnie Roberson down directly in front of the market. He noticed that some of the people standing around were Mob Piru gang members. He noticed shell casings located in the street on Harris Avenue. The scene was investigated later that night by Los Angeles County Sheriff Homicide Detective Kenneth Gallatin, who found .30-caliber and .25-caliber shell casings in the street and slugs in the parking lot.

At the time the shooting was occurring, Hector Guzman was working as a security guard at Taco Unido, which was located on Atlantic Boulevard less than a quarter of a mile from Aikin's Market. Mr. Guzman told a deputy sheriff that night that he heard shots and observed a tan Buick Skylark traveling southbound on Atlantic Boulevard in the number two lane. He also observed a dark-colored car traveling south in the number one lane. The

passenger of the dark car was shooting at the Skylark.[3] The Skylark then crashed into a light pole. Defendant got out of the Skylark by jumping out of the passenger window. After he exited the Skylark, defendant joined another man who had a gun. Defendant was wounded and had blood on his hands. He appeared to be in pain and looked like his arms were injured and he was unable to move his hands. Both defendant and the other man went over a fence. The man with the gun helped defendant over the fence.

Los Angeles County Deputy Sheriff Jose Pineda responded to a radio call about a shooting on Atlantic and when he got to the location he observed a Buick Skylark on the sidewalk where it had collided with a light pole. He went to check on the welfare of the occupants of the Skylark, but there was no one in the vehicle. He noticed several bullet holes in the vehicle on the driver's side. He also observed a rifle on the front floorboard inside the vehicle and several shell casings that were in the vehicle. He also noticed blood on the vehicle.

Los Angeles County Deputy Sheriff Christopher Nee and his partner also responded to a radio call for assistance at the scene of the shooting on Atlantic Boulevard. When he arrived there he saw a beige Skylark resting against the light pole. He contacted Mr. Guzman at that location and received a description of defendant. He was described as an 18- or 19-year-old Black man wearing a dark striped shirt and black pants who was holding his hand as if he had been shot. Deputy Nee then received information that a gunshot victim was being treated about a mile away. Deputy Nee and his partner transported Mr. Guzman to the location where the wounded man was being treated so they could determine if the wounded man was the same person Mr. Guzman had seen jump out of the Skylark.

When they arrived at the location it was a residential area. Deputy Nee saw an ambulance and several sheriff's vehicles. Deputy Nee was informed by other deputies that a wounded man was being treated in the ambulance. Deputy Nee had Mr. Guzman remain in the patrol car while he went to the ambulance to see defendant. Deputy Nee entered the ambulance and observed defendant on a gurney being treated by one or two paramedics. Defendant's left arm was still bleeding and he was being treated while Deputy Nee was in the ambulance. Defendant was wearing a white and blue shirt and blue pants. Deputy Nee asked defendant "what had happened to him, how he had been shot." Defendant said he was seated on a bus bench and heard gunshots from an area farther north on Atlantic Boulevard. He

---

[3]At trial, Mr. Guzman testified that he did not recall telling the deputy sheriff that he observed the passenger in the dark car shooting at the Skylark. The deputy, however, testified that Mr. Guzman made such a statement.

walked to the corner to see what was going on and saw a Mustang speeding toward him. As the Mustang reached the intersection where he was standing, one of the passengers began shooting at him and he was hit in the left forearm. The location where he was shot was 150 yards north of the light pole that the Skylark crashed into. Deputy Nee noticed that defendant's belt had three small buckles and each buckle had a letter on it. The letters were P, O and G. Deputy Nee recognized the belt buckles as symbolizing the Palm and Oak Gangster Crips since he had often seen similar belt buckles being worn by members of that gang. Deputy Nee had worked in that area for seven years and had stopped members of the Palm and Oak Gangster Crips on many occasions. He asked defendant about the belt buckles and defendant said he had been a Palm and Oak member but had quit because he had been shot a week earlier by a Mob Piru gang member named Zabo. Deputy Nee was familiar with the Mob Piru gang and had personally stopped Mob Piru gang members in the area of Aikin's Market. Mr. Guzman was then asked to look at defendant and he identified him as the man he saw jump out the window of the Skylark.[4] Defendant was transported to a hospital emergency room. At the hospital Deputy Nee performed a gunshot residue test and the results did not detect any gunshot residue.

Detective Gallatin, who had found shell casings and slugs at Aikin's market, went to the location where the Buick Skylark had crashed into the pole. He observed eight bullet holes in the driver's side from the front fender to the rear fender. He also saw seven bullet holes in the windshield that appeared to be made by bullets going out the windshield after being fired from inside the vehicle. He also found a .30-caliber carbine on the transmission hump inside the vehicle with an empty magazine. Numerous .30-caliber shell casings were also located inside the vehicle. The following day he reinspected the vehicle at a tow yard and found a .25-caliber pistol under the driver's seat. He also noticed two blood drops on the right rear passenger door and a bloody fingerprint just above the right front passenger window on the roof of the vehicle.

Dale Higashi, a senior criminalist assigned to the firearms identification section of the Los Angeles County Sheriff's Department crime lab, analyzed casings recovered from the Skylark and the area of Aikin's Market and determined that many of them had positively been fired by the .30-caliber carbine found inside the Skylark. He was able to match .25-caliber casings that had been recovered as having been fired by the .25-caliber pistol found in the Skylark. He analyzed the bullet that had been recovered from Lonnie

---

[4]At trial, Mr. Guzman verified that he had identified the man in the ambulance as being the man he saw jump from the vehicle. He was unable at trial to identify defendant as the man he had observed in the ambulance.

Roberson's chest during the autopsy and determined that it had positively been fired by the .30-caliber carbine found in the Skylark.

A court order authorized the taking of a sample of defendant's blood. Detective Gallatin was present when the blood was drawn from defendant. After the blood was drawn defendant asked Detective Gallatin how many guns he found in the Skylark and if he only found the rifle.

Beverly Kerr, a criminalist with the Los Angeles County Sheriff's Department, who is assigned to crime scene investigation and also analyzes blood evidence, compared the bloodstains found on the Skylark to the sample of defendant's blood and determined that the bloodstains on the car matched defendant's blood. Defendant's blood and the bloodstains from the Skylark were then subjected to "PCR DNA" analysis by Gary Harmor, who is a forensic serologist employed by Serological Research Institute. He found that defendant could not be excluded as being the donor of the blood in the bloodstains found on the Skylark, and he determined that only one out of every one billion five hundred ninety million people could produce the set of genetic marker types found in this case.

The defense called Felix Estrada and Brenda Munoz, who lived on Harris Avenue near Aikin's Market. They did not see the shooting but were outside when it occurred. Mr. Estrada saw a black car go by the Market after the shooting and he also saw a light-colored car go by the market. He saw a gun in a window of the dark car but saw no guns in the light-colored car. Ms. Munoz also saw a black car but did not see any guns. She did not see a light-colored car.

It was stipulated during the defense that no fingerprints were found on the .25-caliber pistol or the .30-caliber carbine, and that no prints were found on their respective magazines or any bullets or casings.

Defendant testified in his own behalf that on December 14, 1996, at about 5:30 p.m., he was sitting at a bus stop at Atlantic and Rosecrans after being dropped off by a friend named Richard Parker. He saw another friend of his named Tony Brown who was a passenger in a Buick Skylark. As the Skylark was pulling over so they could talk another car drove by and started shooting at the Skylark. Defendant was shot in the arm. He then went to assist his friend and helped him exit the passenger side of the Skylark. It was Tony Brown and not defendant who jumped out of the Skylark. He ran away with his friend because he was scared. He did not know who was shooting or why they were shooting. He did see a black Mustang driving down the street at the time of the shooting. He got a ride to his house from a lady and told his

brother to call an ambulance. The paramedics came to his house and treated him. The police arrived at the location and he told Deputy Nee that he had never been near the Skylark because his friend had told him the car was stolen and he did not want to place himself near a stolen car. He never mentioned the Skylark or his friend to the police since he did not want to go to jail for a stolen car. Defendant testified that he quit the Palm and Oak gang a week prior to the incident because he had been shot in the leg. He was not shot by anyone from the Mob Piru gang and never told the police that he had been shot by a Mob Piru gang member. He believed he had been shot the week before by some other Crips.

## III. DISCUSSION

Defendant contends: (1) the trial court erred when it ruled his statements to Deputy Nee in the ambulance were admissible since he was not advised of his *Miranda* rights; (2) the trial court erred when it admitted evidence of his membership in the Palm and Oak Gangster Crips; and (3) the evidence is insufficient to support his conviction for first degree murder as an aider and abettor.

### A. *Admissibility of the Statements Made While Defendant Was Being Treated in the Ambulance*

 Defendant contends that his statements to Deputy Nee in the ambulance were made while he was in custody and should have been excluded because he was not advised of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436, 444 [86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 10 A.L.R.3d 974], prior to questioning. He characterizes the questions posed by Deputy Nee as being custodial interrogation within the meaning of *Miranda.*

 It is clear that advisement of *Miranda* rights is only required when a person is subjected to custodial interrogation. (*People* v. *Mickey* (1991) 54 Cal.3d 612, 648 [286 Cal.Rptr. 801, 818 P.2d 84].) Custodial interrogation has two components. First, it requires that the person being questioned be in custody. Custody, for these purposes, means that the person has been taken into custody or otherwise deprived of his freedom in any significant way. (*Ibid.*) Furthermore, in determining if a person is in custody for *Miranda* purposes the trial court must apply an objective legal standard and decide if a reasonable person in the suspect's position would believe his freedom of movement was restrained to a degree normally associated with formal arrest. (*Berkemer* v. *McCarty* (1984) 468 U.S. 420, 442 [104 S.Ct. 3138, 3151-3152, 82 L.Ed.2d 317].) The test for custody does not depend on the subjective view of the interrogating officer or the person being questioned.

(*Stansbury* v. *California* (1994) 511 U.S. 318, 325 [114 S.Ct. 1526, 1530, 128 L.Ed.2d 293].) The only relevant inquiry is " 'how a reasonable man in the suspect's shoes would have understood his situation.' " (*People* v. *Stansbury* (1995) 9 Cal.4th 824, 830 [38 Cal.Rptr.2d 394, 889 P.2d 588].) The second component of custodial interrogation is obviously interrogation. For *Miranda* purposes, interrogation is defined as any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response. (*People* v. *Mickey, supra,* 54 Cal.3d at p. 648.) In reviewing a ruling on the admissibility of a statement we must determine independently, based on undisputed facts in the record and those properly found by the trial court, whether the challenged statements were legally obtained. (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 733 [60 Cal.Rptr.2d 1, 928 P.2d 485].)

We must initially determine if the questions were posed to defendant while he was in custody within the meaning of *Miranda.* The record shows that defendant was in the custody and care of the paramedics who responded to a call for assistance. He was on a gurney and being treated by paramedics when Deputy Nee entered the ambulance. Deputy Nee did not intend to place defendant under arrest at that time. He simply wanted to find out what had happened at the scene of the shooting. He did not know how defendant was involved and whether defendant was a victim or not. He thought he could get some further information to broadcast about suspects in the shooting. His entire conversation with defendant lasted only a couple of minutes. The paramedics continued to work on defendant during the brief conversation.

The question before this court is whether a person who is in the physical custody and care of medical personnel such as paramedics and who is being treated in an ambulance for a gunshot wound at the time of an interview with a police officer should be considered to also be "in custody" for purposes of triggering the requirements of the *Miranda* decision. In *Wilson* v. *Coon* (8th Cir. 1987) 808 F.2d 688, 689-690, the court was faced with an analogous situation. In *Wilson,* the police arrived at the scene of an automobile accident at which an ambulance and two ambulance attendants were present. The medical personnel were trying to treat defendant, who was physically resisting their efforts and who was being physically restrained by one of the attendants. While one of the attendants was treating defendant, the officer asked defendant if he had driven one of the cars involved in the accident. Defendant stated that he had been driving one of the vehicles. The *Wilson* court noted that there was no evidence in the record that the officer had himself detained defendant or ordered the medical attendants to detain him. The court stated that ordinarily that would be the end of its examination of

the applicability of *Miranda*, since there would be no custody for purposes of *Miranda*. However, the court went on to decide if the restraint by the medical personnel, which literally meant defendant was in someone's custody, was inherently coercive and whether the officer took advantage of an inherently coercive situation to interrogate defendant. The court began its analysis with the recognition that ". . . the bare fact of physical restraint does not itself invoke the *Miranda* protections." (808 F.2d at p. 689.) The court found it had to go one step further and determine whether there was anything inherently coercive in the restraint applied by the medical personnel. The court held that the restraint did not create an inherently coercive environment and that no *Miranda* warnings were necessary. (*Ibid.*) The court's ruling was based on three factors. First, it found that a reasonable person would expect a period of restraint and detention by medical personnel would not continue until certain information was divulged to the police but would last only as long as was necessary for treatment in the field and later at a hospital if necessary. Second, the court found that any restraint or detention occurred in public and in view of nonpolice witnesses such as the medical attendants. The court noted that public exposure reduces the likelihood that law-enforcement agents will use oppressive or abusive tactics and rendered the situation less "police-dominated." Third, the court found the restraint and detention was by medical personnel for medical treatment. (*Ibid.*) For these reasons, the court found the situation did not involve a custodial situation within the meaning of *Miranda* and upheld the admissibility of defendant's statement to the police. (*Ibid.*)

Similarly, in *United States* v. *Martin* (9th Cir. 1985) 781 F.2d 671, 673, the court was faced with a situation where the defendant was interviewed by the police while in a hospital. The police had received a report of an explosion and an injured person at an apartment complex. When the police arrived at the apartment the defendant, who was injured in an explosion, had been taken to a hospital. The police found explosive material inside the apartment. The next day the police interviewed defendant at the hospital without giving him any rights under *Miranda* and obtained a statement from him that he had been making bombs for the Sandinistas in Nicaragua. Defendant contended he was in custody because he was not free to leave the hospital and he was deprived of his freedom of action to a significant degree. (*Ibid.*) The court noted that the procedural safeguards of *Miranda* were imposed because the Supreme Court was concerned about the incommunicado interrogation of individuals in a police-dominated atmosphere. The court held that an interview in the hospital was not done in a custodial setting within the meaning of *Miranda*. (*Ibid.*)

Our review of the facts of the instant case leads us to the conclusion that defendant was not in custody within the meaning of *Miranda* when he was

being treated by paramedics in the ambulance prior to being transported to the hospital. Any restraint of defendant's freedom of action was caused by the need to treat his gunshot wound, which was still bleeding and was actively being treated during the interview. He had not been placed under arrest because the police did not know what had happened that caused him to be shot. If he was a victim of a shooting they needed information to put out a broadcast on his assailants. They knew that two shootings had occurred, but they did not know at the time of the interview what started the shooting, who was involved, or even if the two shootings were related to each other. Additionally, we note that the interview was in view of and in the presence of medical personnel who continued to treat defendant during the brief interview. We also note that the questioning was not accusatory or threatening, that defendant was not handcuffed, that no guns were drawn, and that defendant was about to be transported to a hospital and not to a police station or jail. Based on all of the circumstances present, we find a reasonable person in defendant's position would not have believed he was in police custody and that no *Miranda* rights were required prior to questioning.

Since we have found that defendant was not in custody it is not necessary to determine whether the questioning by Deputy Nee constituted interrogation within the meaning of *Miranda*. (*People* v. *Ochoa* (1998) 19 Cal.4th 353, 401 [79 Cal.Rptr.2d 408, 966 P.2d 442].) The police may question a suspect without violating any principles set forth in *Miranda* as long as the person being spoken to is not in custody. (*Ibid.*) We find no basis exists to exclude the statement and uphold the trial court's decision to admit the statement into evidence.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is affirmed.

Turner, P. J., and Grignon, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 10, 1999.

---

*See footnote, *ante*, page 1081.