Filed 1/27/22  P. v. Andersen-Schwegerl CA3

# NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C091092 |
| Plaintiff and Respondent, | (Super. Ct. No. 17F6743) |
| v. | |
| KENDRA ANN ANDERSEN-SCHWEGERL, | |
| Defendant and Appellant. | |

Defendant Kendra Ann Andersen-Schwegerl went out drinking after work with the intention of getting drunk.  Around midnight, defendant rear-ended a car carrying five young people, killing two of them and injuring the others.  Her blood alcohol level was three times the legal limit and she was traveling at 100 miles per hour at the time of the crash.  She was convicted by a jury and sentenced to 30 years to life on two counts of second degree murder and 10 years concurrent on other charges arising from the crash.

Defendant concedes she was guilty of gross vehicular manslaughter and causing injuries while driving under the influence.  But defendant contends the court committed

1

reversible error by admitting two sets of incriminating statements she gave to police, the first at the hospital and the second at the police station after she was advised of her rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  Without the admission of these statements, defendant contends she would not have been convicted of two counts of second degree murder.

With the exception of remand to resentence defendant on one count under Senate Bill No. 567 (2021-2022 Reg. Sess.), we will affirm.

## FACTUAL BACKGROUND

On November 2, 2017, defendant finished her shift at Red Robin in Redding at around 9:15 p.m.  Defendant was upset that evening and told her manager it had something to do with her boyfriend.  Defendant said she needed to get drunk.  Her manager told her to be safe and defendant said she always was, she had a designated driver.  Defendant texted a friend that she was on her way to get drunk at home.

Defendant's coworker that night, Brandon Sergeeff, observed that defendant was sad and complaining about taking care of her sister, spending all of her savings, and having an argument with her father earlier.  After his shift, Sergeeff went to a local bar in Redding, Shameless O'Leery's.  Sergeeff messaged defendant about meeting up with him at the bar.  Defendant joined Sergeeff and a friend at the bar.  She said she had had three beers in the car before coming in.  Defendant had a beer at the bar.  Sergeeff left Shameless O'Leery's and went to the Rusty Nail.  Defendant came into the Rusty Nail later but Sergeeff did not see her drink anything there.

Defendant messaged another coworker, John Fadden, about meeting up at Shameless O'Leery's.  Defendant said she had had a bad day and needed to get hammered.  Fadden recalled defendant had at least one beer at Shameless O'Leery's and a shot of tequila.  They left in separate cars and went to the Rusty Nail.  They had a beer there and were leaving in separate cars with plans to go back to defendant's house.  Fadden asked defendant if she was okay to drive and she said she was.  Fadden asked if

2

she was sure and offered to drive her. Defendant said she was able to drive and drove away. Fadden bought a bottle of tequila and waited at defendant's house. He messaged defendant to see if she was okay but didn't hear anything and went home.

A video surveillance recording of Shameless O'Leery's showed defendant drinking three large beers and a shot of liquor. A video recording of the Rusty Nail showed defendant leaving with Fadden, almost losing her shoe in the parking lot, almost falling over putting it back on, and holding on to Fadden.

Shortly before midnight on November 2, 2017, Daisy Reece, Lacy Jackson, Erica Young, Ralph Sorrel and Clifford Bailey were riding in Jackson's car with Young driving, going to drop off Sorrel. Reece, Young, Jackson and Bailey were roommates and students at Shasta College. They were all in their teens.

Shortly after midnight on November 2, 2017, Michael Snyder was driving south on Churn Creek Road in Redding at 40 miles per hour. He saw a vehicle in his rearview mirror coming up behind at a high rate of speed and straddling two lanes. Snyder went left over the center divider so that the vehicle could pass on the right. He estimated the car was going 80 miles per hour. The car passed him and went through a red light with no brake lights on. He heard the crash and saw a big puff of smoke. Snyder did not see what the car hit. He pulled into a gas station and called 911.

Based on data downloaded from defendant's vehicle and surveillance video, a California Department of Transportation (Caltrans) transportation engineer working with the California Highway Patrol determined that defendant was driving 100 miles per hour at the time of the crash.

Surveillance video from a Circle K convenience store at the intersection where the crash occurred showed the Toyota Corolla stopping at the limit line in the right lane. The Ford Freestyle came southbound straddling the white line between the two lanes, moving at a high rate of speed. The light turned green a second before the collision. A police officer investigating the crash determined that the Toyota had been struck in the rear

3

driver's side. The damage was very significant; the entire car was destroyed. The damage to the Ford matched the damage to the Toyota. The damage to the two vehicles was consistent with a very high-speed collision.

Reece woke up after the collision and saw Young slumped over with her eyes closed. Reece saw Jackson in the back seat with a cut on her arm. Reece passed out. The next thing she remembered was being on the sidewalk and seeing Bailey bleeding. An ambulance took Reece to the hospital where she was treated for bruises and scratches.

Bailey recalled pulling out of their apartment, a quiet car ride, and waking up in the hospital. His jaw was wired shut and a tooth was sticking out of his lip. He had a concussion, a broken jaw and shattered teeth. Sorrel remembered waking up in the hospital with an injured knee and scratches and bruises on his leg and arms.

Autopsies of Young and Jackson determined that they had died from blunt trauma consistent with a high-speed motor collision.

A Redding police officer dispatched to the scene observed a "mangled" Toyota. The driver and a passenger in the back seat were unresponsive. Defendant was in the driver's seat of the other vehicle, a Ford SUV. Defendant had large abrasions on the right side of her forehead and under her right eye. The officer helped defendant out of the car. He noticed a strong odor of alcohol from inside the vehicle and a six pack of beer in the front passenger compartment. When speaking with defendant, the officer noticed she was upset. He could instantly smell alcohol on her breath. Her eyes were red and watery and her speech slurred. Defendant told the officer she got drunk at the Rusty Nail. She said she was trying to go home.

Defendant told a paramedic who transported her in an ambulance to the hospital that she had consumed two or three drinks. The paramedic observed that defendant had slurred speech and was behaving as if intoxicated. Another paramedic observed that defendant was "wobbly on her feet" and "smelled of alcohol." Defendant told the paramedic that she "drank everything under the sun tonight." Assisted by a paramedic,

4

defendant walked into the back of the ambulance.  At the hospital, defendant was transferred to gurney and taken into the emergency room.

A second Redding police officer, Chris Staup, followed the ambulance to the hospital.  He noted that defendant had lethargic expression, her speech was thick and slurred, and her eyes were watery and bloodshot.  Defendant was arguing with medical personnel trying to help her.

An officer at the scene requested Officer Jacob Provencio, the Redding Police Department's driving under the influence (DUI) specialist, to respond because the incident appeared to be a DUI case.  Provencio arrived a short time after defendant was transported to the hospital.  Defendant was on a hospital bed.  She appeared to be upset and was a little belligerent.  She was moving around, waving her arms and being loud.  She didn't appear to be listening to instructions from medical personnel.

Provencio administered a horizontal gaze nystagmus test to defendant in a hospital bed, looking for a jerking motion of the eye in tracking his finger moving side to side, which indicates alcohol impairment.  Defendant was having trouble following instructions, would not follow Provencio's finger, and at one point reached out to try to grab his hand.  Based on the test and some additional information, Provencio determined that defendant's blood alcohol level was above .08 percent.  A subsequent blood draw determined that her blood alcohol level was .254 percent.

After the test, Provencio attempted to question defendant.  Staup was recording.  Clips of the recording were played for the jury.  Defendant initially said she wasn't driving and didn't know what happened.  Then defendant said she drank three 22-ounce Hexagenia beers at "Shameless" but no hard alcohol.[1]  Asked if she felt drunk, defendant said, "No, yeah, maybe, I don't know."  Defendant admitted she felt the effect of the beer

[1]  Hexagenia is 7.1 percent alcohol, much stronger than a domestic beer like Coors, which is about 4 percent.

5

she had.  Asked how she felt, defendant said, "Drunk as shit.  Apparently that's what you wanna to hear."  Provencio said, "I just want you to tell me the truth."  Asked where she was coming from when the collision happened, defendant said she didn't know there was a collision.  Defendant then said she had left her job at Red Robin and didn't go anywhere after Shameless.  Asked when she had something to eat, defendant said sometime that day and then said, "I don't know.  I was having a really bad day today.  I'm like emotionally - everything is just shit."  Defendant denied she was driving and when asked who was, said, "I don't know - I don't know who was driving.  All I care about is myself and how I feel right now.  I don't give a shit who was driving or how they were driving, they could've been driving in circles and I don't fucking know."  Defendant said, "But all I know is I'm okay and . . . ."

Based on his observations of defendant at the hospital, Provencio stated his opinion that she was intoxicated to the point that she was not able to operate a motor vehicle safely.

Close to 4:00 a.m., defendant was medically cleared to leave the hospital.  Provencio told defendant she was under arrest.  Provencio took defendant to the Redding Police Department for a further interview.  Clips of a video and audio recording of the interview were played for the jury.

Provencio advised defendant of her *Miranda* rights and defendant stated she understood them.  Asked the last thing she remembered about that night, defendant said she remembered nothing and then that she went to Shameless by herself.  Asked what car she had, defendant said a "Honda Ford" and then a "free style Ford.  2017."  Defendant said she was not driving but could not tell who was driving.  When Provencio said he could not understand what she was saying, defendant said, "I know it.  I can't really understand myself very well.  And I'm really sorry but, like, only thing I can think of right now is trying to get sleep and trying to be okay because I'm not okay."  Provencio drew her attention to her clothes from the hospital, reminded her that she was in the

6

hospital because she was in a crash, and asked her how the crash happened. Under repeated questioning, defendant agreed that she drove herself to Shameless. Provencio repeatedly asked defendant to sit up, look at him and have some water. Defendant complained of pain and said she wanted to go home and go to bed. Asked why people get arrested for driving under the influence and why it's against the law, defendant said "[b]ecause you're being dumb." Asked what could happen if a person is driving under the influence, defendant said: "You can get into an accident and could really hurt somebody. I get it. I'm surprised that I'm even fucking in the predicament that I'm in and I'm so mad at myself. I won't probably sit there and beat myself up for like a week." Asked what happens when people drive under the influence of alcohol, defendant said "accidents" happen and "[d]eath" can happen in an accident.

Defendant agreed that a DUI is dangerous but answered, "I couldn't tell you," when asked why she was driving after drinking knowing that it's dangerous. Asked how much she had to drink today, defendant said four 20-ounce Hexagenias and a vodka soda at Shameless O'Leery's.

Defendant said that she did not remember the collision or hitting another car. Provencio told defendant she hit another car, there were five people in the car, and two of the girls in the car were killed. He told defendant she was in the driver's seat and the only person in the car. Defendant said she did not know how this happened.

The prosecution presented evidence that defendant's orientation at Red Robin included training about responsible alcohol service that included recognizing the signs of intoxication. In 2008 and 2013, defendant signed Department of Motor Vehicles (DMV) forms advising that driving under the influence of alcohol is extremely dangerous to human life and if someone is killed as a result, defendant could be charged with murder. Defendant's friends and coworkers testified that, after drinking, defendant would walk home, get a ride with a sober driver, or take an Uber.

7

A defense expert, Dr. Michael Motley, opined that the DMV advisements were not conspicuous and the language was hard to understand. He concluded the warning was inadequate and someone could fill out the form without reading the advisement.

Testifying for the defense, Dr. John Kelsey, an emergency room physician who treated defendant at the hospital, testified that defendant had a contusion and abrasion on her forehead, which, along with her agitated and uncooperative behavior, led him to believe she may have had a concussion. Dr. Kelsey ordered a CAT scan but defendant would not hold still. She was flailing her arms about. Defendant was trying to hit nursing staff. Defendant received 1.5 milligrams in two doses of Ativan, a sedative, five milligrams of Haloperidol, an antipsychotic, and four milligrams of morphine, for pain if her agitation was potentially caused by pain.[2] Defendant had a fractured spine, which could cause pain. Dr. Kelsey testified that morphine can interfere with the ability to think. The combination of Ativan and alcohol can slow a person's thought processes, including processing information. Defendant was sleepier after receiving Ativan. Defendant did not have any bleeding in the brain and Dr. Kelsey did not diagnose her with a concussion.

## DISCUSSION

Defendant filed motions in limine to exclude her prearrest and postarrest statements to Provencio, which defendant supported with transcripts of the audio recording made at the hospital and the video and audio recording of the interview at the police station, as well as the recordings themselves, and the results of defendant's blood sample analysis showing a .254 percent blood alcohol level. The trial court conducted a hearing on the motions under Evidence Code section 402 with testimony from Staup,

---

[2] Defendant was given this medication at the hospital after Provencio interviewed her there and before she was interviewed at the police station.

8

Provencio and Dr. Kelsey. The court denied both motions. We affirm the court's rulings.

*Standard of Review*

" 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.' [Citation.] 'Whether a confession was voluntary depends upon the totality of the circumstances.' [Citations.] 'On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.' [Citation.] The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review. [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176-1177 (*Linton*).)

*Prearrest Statements*

Defendant contends that evidence of her prearrest statements recorded at the hospital should have been excluded because: (1) her statements were involuntary; (2) the statements were the result of custodial interrogation in violation of *Miranda*; and (3) she had invoked her right to remain silent.

Defendant contends her statements at the hospital were involuntary because (1) Provencio "conducted a field sobriety test . . . while she was on a gurney in the emergency room undergoing medical treatment for her injuries," (2) she "had no opportunity to leave" because she "had to undergo medical examinations," (3) while Provencio "questioned her for the purpose of conducting an investigation for driving under the influence," (4) she "repeatedly asked to go home and reported extreme pain," and (5) "she was extremely intoxicated" with a blood alcohol content of .254 percent.

"In evaluating the voluntariness of a statement, no single factor is dispositive. [Citation.] The question is whether the statement is the product of an ' "essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion. [Citation.]"

9

(*People v. Williams* (2010) 49 Cal.4th 405, 436 (*Williams*).) " 'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." [Citation.]' [Citation.]." (*Ibid.*)

" 'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions. [Citations.] A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it "does not itself compel a finding that a resulting confession is involuntary." [Citation.] The statement and the inducement must be causally linked. [Citation.]' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 347; *Williams, supra*, 49 Cal.4th at p. 437; *Linton, supra*, 56 Cal.4th at p. 1176.)

Reviewing the record of Provencio's questioning defendant in the hospital, we find no evidence of the crucial element of police coercion, much less incriminating statements that were the product of police coercion. Provencio questioned defendant a short period of time, some 10 minutes in the recording. Provencio posed his questions in a calm and deliberate manner. (*People v. Perdomo* (2007) 147 Cal.App.4th 605, 618 (*Perdomo*).) His tone of voice was conversational, not threatening. (*Ibid.*) The questions themselves were not accusatory or threatening but rather straightforward "where, what, when" questions about defendant's drinking that night. (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1091 (*Mosley*).) Provencio interviewed defendant in public in view of medical personnel as they tried to treat her. The record of defendant's statements in the hospital in response to Provencio's questions contains no evidence of coercion, threats, promises, or deceptive police interrogation.

Defendant was restrained when she arrived at the hospital because she was hitting medical staff. The audio tape includes an exchange prior to Provencio's arrival at the

hospital between Dr. Kelsey and a medical staff person where he asked, "Restrained?," and receives an affirmative response. At the hearing, Dr. Kelsey testified that because defendant was agitated, "[a]pparently at one point, based on nursing notes, she had to be handcuffed by the officers because she was swinging at staff." Provencio testified that defendant was not restrained in any way when he questioned her.

Detention for medical examination or treatment is not an "inherently coercive" police environment. (*Wilson v. Coon* (8th Cir. 1987) 808 F.2d 688, 689-690 (*Wilson*) [defendant questioned while restrained by paramedic in an ambulance]; *Mosley, supra*, 73 Cal.App.4th at pp. 1089-1090 [defendant questioned while "in the physical custody and care of medical personnel," citing *Wilson*].) Defendant claims she was handcuffed while Provencio questioned her, but the supporting citation defendant provides is to her request to be "unlocked," which she made a substantial period after questioning had ended and Provencio had placed her under arrest.

Defendant contends that Provencio questioned her to investigate the crime of driving under the influence. That circumstance does not render her answers involuntary. "The business of police detectives is investigation, and they may elicit incriminating information from a suspect by any legal means." (*People v. Jones* (1998) 17 Cal.4th 279, 297.) " 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive they tend to produce a statement that is both involuntary and unreliable.' [Citation.]" (*Id.* at pp. 297-298; see also *People v. Chutan* (1999) 72 Cal.App.4th 1276, 1282 ["failure to brief a suspect on the official plan for an interrogation" does not "constitute coercion"].)

Defendant's complaints of pain and statements that she wanted to go home do not establish coercion. The transcript and recording of the interview do not indicate that defendant was in intolerable pain such that her will to resist making incriminating statements was overborne. For example, during questioning defendant vociferously expressed anger at medical staff for minor pain she experienced from treatment. When

defendant complained of pain from bandaging, a medical staff person responded, "It's just tape," and defendant yelled, "I know it's just tape, but it fucking hurts." Our review of the transcript and audio recording of defendant's interrogation reveal statements were not the involuntary result of police coercion exploiting her physical condition. (*Perdomo, supra*, 147 Cal.App.4th at p. 618, fn. 22 [comparing *Mincey v. Arizona* (1978) 437 U.S. 385, 401-402, where "the coercive police activity included lengthy, relentless questioning, while the defendant was in great pain, in and out of consciousness, while disregarding his requests for the interrogation to cease and for counsel"].)

As for defendant's intoxication, absent police coercion, "[i]ntoxication alone does not render a confession involuntary." (*People v. Debouver* (2016) 1 Cal.App.5th 972, 978; *People v. Maury* (2003) 30 Cal.4th 342, 411.) Defendant "makes no showing that any false promises of leniency were made or that [she] suffered from a physical, mental or alcohol/drug impairment that was exploited by the police to coerce a confession." (*Debouver, supra*, at p. 978.)

Lastly, defendant contends that the "failure to give *Miranda* warnings created a presumption of compulsion" in her case. However, " 'absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.' " (*People v. Storm* (2002) 28 Cal.4th 1007, 1030-1031, quoting *Oregon v. Elstad* (1985) 470 U.S. 298, 314.) There is " 'a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will' " and the consequences of an incriminating statement " 'freely given in response to an unwarned but noncoercive question . . . .' " (*Storm, supra*, at p. 1030, quoting *Elstad, supra*, at p. 312.)

Our review of the audio recording and transcript of Provencio's questioning defendant in the hospital reveals no evidence of police coercion. The trial court correctly ruled that defendant's statements were not involuntary.

12

Turning to defendant's next contention regarding her prearrest statements, we conclude that the trial court correctly ruled that defendant was not subjected to custodial interrogation at the hospital in violation of *Miranda*, because defendant was not in police custody while being treated for her injuries at the hospital.

In *Mosley*, the court articulated the applicable principles: "It is clear that advisement of *Miranda* rights is only required when a person is subjected to custodial interrogation. [Citation.] Custodial interrogation has two components. First, it requires that the person being questioned be in custody. Custody, for these purposes, means that the person has been taken into custody or otherwise deprived of his freedom in any significant way. [Citation.] Furthermore, in determining if a person is in custody for *Miranda* purposes the trial court must apply an objective legal standard and decide if a reasonable person in the suspect's position would believe his freedom of movement was restrained to a degree normally associated with formal arrest. [Citation.] The test for custody does not depend on the subjective view of the interrogating officer or the person being questioned. [Citation.] The only relevant inquiry is ' "how a reasonable man in the suspect's shoes would have understood his situation." ' [Citation.] The second component of custodial interrogation is obviously interrogation. For *Miranda* purposes, interrogation is defined as any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response. [Citation.]" (*Mosley, supra*, 73 Cal.App.4th at pp. 1088-1089.)

The court in *Mosley* concluded that the defendant was not in custody within meaning of *Miranda* when he was being treated by paramedics in an ambulance. Any restraint on his freedom was the need to treat his gunshot wound and he was being treated during the interview, which occurred in full view of medical personnel. He was not under arrest. The questioning was not accusatory or threatening. He was not handcuffed during questioning, no guns were drawn, and he was in an ambulance about to be transported to a hospital, not jail. (*Mosley, supra*, 73 Cal.App.4th at pp. 1090-1091.)

13

Similar circumstances were present in Provencio's prearrest interview of defendant in the hospital.

Defendant attempts to distinguish *Mosley* because "[s]uspicion had focused on her" and "she was strapped to a gurney in the hospital, where Provencio was interrogating her about a fatal collision." In *Mosley*, the officer was trying to find out what had happened and did not know how the defendant was involved, whether he was a victim or not. (*Mosley, supra*, 73 Cal.App.4th at pp. 1089-1091.)

However, "*Miranda* warnings are not required simply because a person has become a suspect in the officer's mind." (*Linton, supra*, 56 Cal.4th at p. 1167; see also *Oregon v. Mathiason* (1977) 429 U.S. 492, 495; *People v. Moore* (2011) 51 Cal.4th 386, 402.) Further, defendant was restrained so that medical personnel could provide treatment. " '[T]he bare fact of physical restraint [by medical personnel] does not itself invoke the *Miranda* protections.' " (*Mosley, supra*, 73 Cal.App.4th at p. 1090, quoting *Wilson, supra*, 808 F.2d at p. 689.) *Miranda* is intended to protect individuals from "incommunicado interrogation . . . in a police-dominated atmosphere." (*Mosley, supra*, at p. 1090.) "Only those interrogations that occur while a suspect is in police custody . . . 'heighte[n] the risk' that statements obtained are not the product of the suspect's free choice. [Citation.]" (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 268-269; see also *People v. Milham* (1984) 159 Cal.App.3d 487, 501 [defendant may have been physically unable to leave "but not by virtue of police conduct"].) We conclude that defendant was not in custody during her prearrest statements to Provencio.

Since defendant was not in custody, we need not determine whether Provencio's questions amounted to interrogation under *Miranda*. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401 (*Ochoa*).) There is no *Miranda* violation where the police question a suspect who is not in custody. (*Ibid.*)

14

Finally, defendant contends that she invoked her right to remain silent in the hospital because she "repeatedly told Provencio that she was in pain, that it hurt everywhere, that she wanted to go home, and that she wanted him to leave her alone."

As set forth in the transcript, after Provencio initiated questioning at the hospital, defendant said:  (1) "Everywhere it hurts"; (2) "Everything hurts"; (3) "I just need to go home.  I just want to go home"; (4) "Everything's (unintelligible) really bad, and I don't want to talk to . . ."; (5) "I want to go home and lay down"; (6) "I want to fucking go home"; (7) "Leave me alone"; (8) "Leave me alone.  I don't know why a fucking officer . . ."; and (9) "I just want to go home."

Defendant relies on the rule that "[p]ursuant to *Miranda,* '[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' "  (*People v. Peracchi* (2001) 86 Cal.App.4th 353, 360, citing *Miranda, supra*, 384 U.S. at pp. 473-474.)  "Once a defendant invokes his or her right to remain silent, that decision must be 'scrupulously honored.' " (*Peracchi, supra*, at p. 360, citing *Michigan v. Mosley* (1975) 423 U.S. 96, 104.)

In this instance, however, *Miranda* does not apply because defendant was not in custody at the hospital when she made her prearrest statements.  (*Ochoa, supra*, 19 Cal.4th at p. 401.)  In *People v. Tom* (2014) 59 Cal.4th 1210 (*Tom*), the California Supreme Court considered invocation of the right to remain silent in a pre-*Miranda* context, where, as here, invocation of the right to remain silent was based on the Fifth Amendment privilege against self-incrimination.

In *Tom*, the court held that a defendant was required to clearly invoke the Fifth Amendment privilege against self-incrimination in order to preclude admission at trial of evidence of his postarrest, pre-*Miranda* silence, in the absence of custodial interrogation. (*Tom, supra*, 59 Cal.4th at p. 1225.)  The defendant had been arrested by police for driving under the influence in a fatal car crash but, in his contact with police, never asked

15

about the welfare of the people involved in the collision.[3]  (*Tom, supra*, 59 Cal.4th at p. 1219.)

To preclude evidence of defendant's silence, the court concluded that the burden was on the defendant to establish the privilege had been clearly invoked.  (*Tom, supra*, 59 Cal.4th at p. 1225.)  An individual who wishes to invoke the privilege to remain silent must " 'do so unambiguously.' "  (*Ibid.*)  This requirement results in an objective inquiry that avoids the difficulties of proof and guides police officers on how to proceed in the face of ambiguity.  (*Ibid.*)  The inquiry in a pre-*Miranda* context is whether a "reasonable police officer in the circumstances would understand that the defendant had invoked the privilege . . . ."  (*Id.* at p. 1228.)

Here, defendant was questioned in a pre-*Miranda* context and, as we have held, was not in custody.  In a pre-*Miranda,* noncustodial context, a defendant may invoke the Fifth Amendment privilege and cause interrogation to end, but the defendant must clearly invoke the privilege.  The objective inquiry is whether the defendant clearly invoked the privilege, which the defendant has the burden to establish.

We conclude that defendant failed to carry her burden to establish that she clearly invoked the privilege against self-incrimination during the prearrest interview.  To begin with, defendant did not request legal counsel.  (*Tom, supra*, 59 Cal.4th at p. 1225.)  " 'Although a suspect need not "speak with the discrimination of an Oxford don" [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer would understand the statement to be a request for an attorney.' "  (*Ibid.*, quoting *Davis v. United States* (1994) 512 U.S. 452, 459.)  Further, instead of expressly invoking the right to remain silent, defendant answered Provencio's questions.  (*Tom, supra*, at p. 1226; *Salinas v. Texas* (2013) 570 U.S. 178, 182.)  In an

---

[3]  Provencio testified at the trial that after he had informed defendant that, she had killed two people and injured three, she did not ask any questions about them.

16

exchange with Provencio where he said, "Just talk to me," defendant responded, "I'm trying to talk to you," indicating her desire to answer his questions, not remain silent.

The audio recording and transcript of the hospital interviews reveal that defendant's statements that she was in pain were made to medical personnel who were treating her during the interview, not the police.

Remarks "express[ing] a general desire to go home" did not indicate that defendant might be invoking her right to remain silent. (*Walkinhawk v. Pliler* (9th Cir. 2006) 184 Fed.Appx. 653, 654; but see *People v. Villasenor* (2015) 242 Cal.App.4th 42, 65 [juvenile offender invoked right to silence by demanding to go home 13 times in 14 minutes of questioning, including his statement " 'I know my rights' " made in connection with demands to be taken home].)

Likewise, defendant's statements that she wanted to be left alone did not unambiguously invoke her right to remain silent. (See *People v. Nelson* (2012) 53 Cal.4th 367, 383 [defendant did not unambiguously assert his right to silence in statement to police to " 'leave me alone' "]; *Williams, supra*, 49 Cal.4th at p. 433 [" 'merely expressions of passing frustration or animosity' " towards police do not invoke right to silence]; see also *People v. Krebs* (2019) 8 Cal.5th 265, 313 [defendant's request reasonably interpreted to mean he wanted to be left alone for a moment did not unambiguously invoke his right to remain silent].)

We conclude the trial court correctly denied defendant's motion in limine to exclude evidence of her prearrest statements to Provencio in the hospital.

*Postarrest Statements*

Defendant contends that evidence of her postarrest statements at the police station should have been excluded because: (1) prearrest statements after her invocation of her right to remain silent tainted postarrest statements after she received *Miranda* warnings, and (2) her postarrest statements were involuntary due the physical trauma of the crash combined with the alcohol and drugs in her system.

17

The People assert that defendant forfeited the claim that her post-*Miranda* statements were tainted by not raising it in the trial court. Defendant responds "[b]ecause the in limine motions encompassed both the pre-arrest and post-arrest statements as *Miranda* violations and coerced statements, counsel's objections were broad enough to inform the trial court that the post-arrest statements were tainted by the prior unlawful statements." We agree that this claim was arguably raised by the parties' in limine motions sufficient to preserve the issue on appeal. (*Williams, supra*, 49 Cal.4th at pp. 424-425.)

In any event, we conclude this claim lacks merit. (*Williams, supra*, 49 Cal.4th at p. 425.) Defendant's statements made after she received *Miranda* advisements were not tainted because Provencio did not elicit defendant's preadvisements statements in violation of *Miranda*. (*People v. Mickey* (1991) 54 Cal.3d 612, 652 ["Because the tree was not poisonous, its fruit was not tainted"].)

We conclude that defendant's claim that her post-*Miranda* statements at the police station were involuntary also lacks merit. Defendant argues that, not only was she intoxicated, but under the influence of the drugs administered at the hospital. Defendant points to the many instances where Provencio told her to sit up, keep her eyes open and look at him, or defendant expressed the desire to go home and go to bed.

In the transcript and video recording of the interview at the police station, Provencio multiple times asked to sit up and look at him and not go to sleep during questioning: (1) "Kendra sit up for me"; (2) "Look at me"; (3) "Open your eyes and look at me"; (4) "Sit up and look at me, okay? You're doing better but sit up and look at me"; (5) "Well can - can you - can you at least look at me and talk to me"; (6) "Can you - can you sit up a little bit? Kendra you can't go to sleep right now"; (7) "Kendra, can you look at me so we can talk?"; (8) "Kendra there's - look at me, this is very important"; (9) "I need you to open your eyes and look at me"; and (10) "I need you to look - sit up and look at me."

Defendant also said at various times in the interview: (1) "the only thing I can think of right now is trying to get sleep"; (2) "I want to go home officer. I want to go home and go to bed"; (3) "I know and I just want to go to bed"; and (4) "I just want to go home and lay in my bed. Can I do that soon please."

Although defendant was falling asleep and Provencio had to keep her awake, defendant provided responsive answers to questions.

Defendant does not contend that her affirmative responses to Provencio's questions advising her of *Miranda* rights were involuntary. Defendant responded "Yes sir" to questions if she understood her right to remain silent, that anything she said would be use against her, and her right to an attorney during questioning, free of charge if she could not afford one.

Defendant's answers were clear and responsive to Provencio's questions about why people get arrested for driving under the influence. Defendant said, "it's against the law to drink and drive." In response to Provencio's question regarding what could happen if a person is driving under influence, defendant said, "You can get into an accident and you could really hurt somebody. I get it." Defendant also responded, "Accidents happen" to the same question, and to Provencio's question what can happen in an accident, defendant responded, "Death." When asked "Would you say that DUI is dangerous," defendant responded, "Yes."

Asked how much defendant had to drink that day, she was precise in her answers: "four beers and maybe one drink," the drink was a "Vodka soda," the beers were "Hex," the beers were "20 ounce" in size, and she drank them at "Shameless."

The ingestion of drugs and alcohol does not compel the conclusion responses to questions were involuntary rather than the product of rational intellect and free will. (*People v. Loftis* (1984) 157 Cal.App.3d 229, 235; *People v. Taylor* (1980) 112 Cal.App.3d 348, 360-361; *Perdomo, supra*, 147 Cal.App.4th at p. 617.) Nor does the fact that a defendant is in "a heavy state of somnolence" and "heavily under the influence

19

of drugs," such that the officer had to wake up the defendant during the interview, establish that the defendant's responsive answers to questions were involuntary. (*Taylor, supra*, at p. 361.) "The critical question is whether the accused's abilities to reason, comprehend, or resist were so disabled that he was incapable of free, rational choice." (*Loftis, supra*, at p. 236.) Based on our independent review of the recording and transcript of defendant's interview in the police station, defendant was not so disabled as to be incapable of free, rational choice.

Defendant relies heavily on *In re Cameron* (1968) 68 Cal.2d 487, 498, but the circumstances in that case bear little resemblance to defendant's interview at the police station. In *Cameron*, the court found that the defendant's responses to police questions in an initial interview were voluntary despite his having a blood alcohol content of .18 percent, because the defendant consistently maintained he had no memory of the events. (*Id.* at pp. 499-500.) But when the defendant was subsequently administered an "inordinately high" dose of Thorazine (*id.* at p. 501), 300 milligrams where the normal dose would be 25-50 milligrams (*id.* at pp. 494-495), at a psychiatric hospital, combined with his blood alcohol content, the effect was to render him incapable of anxiety or worry (*id.* at p. 500, fn. 6). The defendant's psychiatric state was such that he did not care what happened to him and was not aware that he was charged with a serious crime. (*Id.* at pp. 500-501.) As a result, during a police interview, the defendant was persuaded by leading questions into remembering more and more details of the crime, some of which did not occur. (*Id.* at p. 500.) The court found that under the influence of Thorazine, defendant's "will to resist was destroyed because he was rendered unable to comprehend the seriousness of his predicament or the significance to him of acceding step by step to 'remembering' the prosecution's reconstruction of his crime." (*Id.* at p. 502, fn. omitted.)

In this instance, there is nothing in the recording and transcript indicating that defendant's will to resist was destroyed such that she was persuaded by Provencio into reconstructing details of the crime. In the interview at the hospital, defendant said that

she did not remember driving or the details of the collision and she continued to maintain she did not remember at the police station. But in both interviews, she could clearly remember she drank Hexagenia beers at Shameless O'Leery's. If anything, the drug-induced interviews in *Cameron* present a marked contrast with defendant's interview by Provencio at the police station.

Further, nothing in the recording exhibits police coercion. (*Perdomo, supra*, 147 Cal.App.4th at p. 618.) Again, the interview was relatively short, approximately 30 minutes. Provencio took the handcuffs off defendant so she could more easily drink the water he provided. Provencio's questions were not threatening or accusatory. His tone was calm, deliberate and conversational. At the conclusion of the interview, Provencio was solicitous of defendant's condition, telling her take it "nice and easy" as they left the interview room. The record is devoid of any suggestion that Provencio resorted to physical or psychological pressure to elicit statements from defendant. (*Id.* at p. 619.)

We conclude that trial court did not err in denying defendant's motion in limine and admitting evidence of defendant's postarrest statements.

Finding no error, we need not reach defendant's claim that, without admission of defendant's prearrest and postarrest statements, the evidence was insufficient to sustain her second degree murder convictions. (Cf. *People v. Homick* (2012) 55 Cal.4th 816, 860, fn. 28.)

### *Senate Bill No. 567*

On count 5, the trial court sentenced defendant to the aggravated term of three years for driving under the influence causing injury. (Veh. Code, § 23153, subd. (a).) In supplemental briefing, defendant contends that this case must be remanded for resentencing on that count in light of Senate Bill No. 567 (2021-2022 Reg. Sess.), which amended Penal Code section 1170, subdivision (b), effective January 1, 2022 (Stats. 2021, ch. 731, § 1.3)

The amendment to Penal Code section 1170 makes the middle term of the determinate sentencing triad the presumptive prison term unless specified circumstances exist. (Pen. Code, § 1170, subd. (b)(1)-(2).) A trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and *the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial*. Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements. The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense." (Pen. Code, § 1170, subd. (b)(2), italics added.)

The People concede that Penal Code section 1170, subdivision (b), as amended by Senate Bill No. 567, applies retroactively to defendant. (*In re Estrada* (1965) 63 Cal.2d 740, 742.) While the trial judge explained the aggravating factors justifying sentencing defendant to the upper term, the People further concede that defendant did not stipulate to the facts nor were they found to be true beyond a reasonable doubt. Therefore, this matter must be remanded for resentencing on count 5.

We agree. Accordingly, we will vacate the sentence on count 5 and remand for resentencing.

22

## DISPOSITION

The sentence on count 5 is vacated and the matter remanded to the trial court to resentence defendant under Penal Code section 1170 as amended by Senate Bill No. 567. The judgment is otherwise affirmed.


                                                 /s/
                                       RAYE, P. J.


We concur:


        /s/
MAURO, J.


        /s/
DUARTE, J.