Filed 8/6/24

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B329607 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA116490) |
| v. | |
| ERIC GONZALEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James Otto, Judge. Affirmed in part, sentence vacated, and remanded.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

---

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, only the Factual and Procedural Background, part I of the Discussion, and the Disposition are certified for publication.

Assistant Attorney General, Wyatt E. Bloomfield, Marc A. Kohm, and Lauren Guber, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted Eric Gonzalez of two counts of first degree murder (Pen. Code, § 187, subd. (a)) and found true firearm use allegations (*id.*, § 12022.5, subd. (a)). Gonzalez appeals, arguing: (1) the prosecutor improperly exercised a peremptory challenge to a juror in violation of Code of Civil Procedure section 231.7;[1] (2) he was subjected to a custodial interrogation without the advisements required by *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and his statements were improperly admitted; (3) the trial court erred in refusing to instruct the jury on voluntary manslaughter based on imperfect self-defense; (4) the prosecutor committed misconduct by stating that the proof beyond a reasonable doubt standard is met every day in courts across the country; and (5) the upper term sentence for the firearm enhancement must be vacated because the court did not find any aggravating factors true beyond a reasonable doubt.

In the published portion of this opinion, we conclude there was clear and convincing evidence that an objectively reasonable person would view the rationale for the prosecutor's peremptory challenge as unrelated to the prospective juror's race, and that the reasons the prosecutor articulated bore on the juror's ability to be fair and impartial. We therefore determine the trial court did not err in overruling the defense objection to the peremptory challenge. In the remainder of the opinion, we conclude Gonzalez

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

was not in police custody during the challenged interrogation, substantial evidence did not support instructing the jury on imperfect self-defense, and the prosecutor's argument concerning the attainability of the proof beyond a reasonable doubt standard was not improper or prejudicial. The Attorney General does not dispute Gonzalez's final contention regarding the sentence on the firearm enhancement, and we likewise agree that the court erred. Accordingly, we vacate Gonzalez's sentence and remand the matter for resentencing. We otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The underlying offenses*

In March 2021, Kathy H. found a firearm in her daughter's dresser. Upon finding the gun, Kathy H. called her boyfriend, Alexis Casarez, and asked him to get rid of it. She did not know how Casarez disposed of the gun, which belonged to Andy Gaeta.

On July 3, 2021, Kathy H. learned that Gaeta had been threatening her daughter once he found out the gun was gone. The daughter told Kathy H.: " '[Gaeta] won't stop. He is really mad, Mom. He wants the gun.' " Casarez overheard this conversation and asked for Gaeta's phone number. Casarez called Gaeta and identified himself as the young woman's stepdad. Casarez said Gaeta should not have left the gun with her, it was gone, and Gaeta should consider it a loss. Gaeta was not satisfied. He stated that it was not Casarez's gun to get rid of and that they needed to meet up. Casarez arranged for them to meet at his mother's house that evening. Casarez, Kathy H., and her brother, Angel Mandac, drove to the house and waited for Gaeta.

Eventually, Gaeta showed up with Gonzalez. Casarez told Gaeta that they would talk to him alone and Gonzalez could wait

3

outside.  Gaeta entered the home and sat on the couch with Kathy H. and Casarez.  Mandac remained in a bedroom so Gaeta would not feel " 'on guard' " but told Kathy H. he would come out and talk if things could not be resolved.  Gaeta continued to insist that it "wasn't [Kathy H.'s or Casarez's] gun to get rid of."  He said he wanted another gun or money.  Everyone was talking calmly, although Casarez was frustrated.

According to Kathy H., neither she nor Casarez threatened Gaeta.  At some point, Mandac joined the conversation.  He also sat on the couch.  Mandac shook Gaeta's hand and explained that he was Kathy H.'s brother and had heard what was going on.  He told Gaeta that he would help him but told him never to contact Kathy H.'s daughter again.  They exchanged phone numbers.  Mandac then went out on the porch.  Kathy H. could hear but not see what happened there.  Mandac said " 'he was Striker from Pedro' " and Gonzalez said "he was Troubled from the West Side."  Kathy H. understood this to mean that Gonzalez was "part of the gang from Wilmington," the West Side Wilmas.  Mandac's statement meant that he was a member of the Rancho San Pedro gang.

Gonzalez told Mandac, " 'The Ranch ain't wanted here," and that Mandac needed to "make something happen" that evening.  Mandac replied that he had discussed the matter with Gaeta and they had arranged something.  Gonzalez replied, " 'No, you're going [t]o make something happen, and the Ranch ain't wanted here.' "  His tone was loud and he was not calming down.  According to Kathy H., Gonzalez was not trying to be reasonable like Gaeta but instead repeated, " 'the Ranch ain't wanted here, motherfucker.' "  Gaeta was still in the living room.  Mandac was

4

calm and "just trying to let [Gonzalez] know that he is not here for that, for the San Pedro/Wilmington thing . . . ."

After a couple of minutes, Gaeta went outside and his demeanor changed. He seemed to doubt that Mandac would follow through. Gonzalez continued to get more aggressive and stated that Mandac needed to "make something happen." Mandac told Gaeta that he would call him and would take care of him. Gonzalez continued to say, " 'The Ranch ain't wanted here.' " Mandac replied, " 'You know, I'm 40-something years old. I'm not here for that.' " During this exchange, Casarez was standing inside by the door, next to Kathy H.

Kathy H. felt that Gonzalez was escalating the situation. She told Casarez they needed to leave because she was scared. Casarez told Gaeta they would call him. It was quiet for a few seconds before Kathy H. heard gunshots coming from outside the house. Kathy H. could not see what was going on. Casarez told her to run. Kathy H. ran through the house to the backyard and hid behind a shed.

Kathy H. testified that she did not see Casarez or Mandac with a gun that evening. After a time, Kathy H. left the shed and went to the other house on the property to call her other brother. Once she reached him, he told her to go check on Mandac and Casarez. Kathy H. was still scared and did not check. Police officers and paramedics arrived on the scene. Kathy H. did not want to speak with the officers and only wanted to see her brother and boyfriend. She went to the hospital and was informed early the next morning that both had died.

*The investigation*

Detectives Manuel Armenta and Issac Fernandez responded to the scene of the shooting on July 4. Evidence

collected at the crime scene included expended casings located inside and directly outside the house, blood spatters, two cell phones, and two firearms. One firearm, a nine-millimeter semiautomatic, was loaded with 13 live rounds. The other, a .40-caliber handgun, was also loaded and contained six live rounds. The nine-millimeter gun was recovered near Casarez's body, while the .40 caliber was recovered from Mandac's body. Crime scene photographs showed bullet impacts to the inside of the living room and the exterior of the residence.

Fernandez later obtained video surveillance from several locations near Casarez's mother's house. One of the videos showed Gonzalez's brother, Sebastian Gonzalez, driving and parking a dark vehicle on the street. Two individuals got out of the vehicle and walked towards the residence.[2] Detectives identified one of the individuals as Gaeta. Another video showed the dark vehicle backing up and two individuals running towards it. Fernandez also collected body-worn camera footage from officers who first responded to the scene. One video showed Mandac's body near the threshold of the house and Casarez's body inside the house. Another video showed an officer recovering the .40-caliber handgun from a holster on Mandac's body. Armenta also collected video evidence from a hospital, which showed the dark sedan pull up shortly after midnight on July 4, 2021.

Armenta and Fernandez conducted a recorded interview of Gonzalez at the hospital on July 4, 2021. Gonzalez said he had been shot in the leg and shoulder. When asked who shot him,

---

[2]    Because Gonzalez and his brother have the same last name, we refer to Sebastian Gonzalez by first name only. No disrespect is intended.

Gonzalez replied: "They didn't say nothing. They just pulled up on the side of me, and I was walking home." He claimed his assailants were in a white car and that he had been walking home from the house of his friend's mother.

### Forensic analyses

Mandac and Casarez were shot a total of 16 times. An autopsy revealed that Mandac had sustained nine gunshot entry wounds, including to the back of his head and left upper chest. Casarez sustained seven gunshot entry wounds, including to the front part of the top of his head, top right shoulder, and right chest.

A Los Angeles Police Department criminalist and firearms analyst testified that he examined the nine-millimeter firearm that was recovered near Casarez's body, as well as 20 discharged cartridge cases. The criminalist testified that the nine-millimeter firearm fired four of the cartridge cases. Two additional, unrecovered guns fired the 16 remaining cartridge cases: 11 by one gun and five by the other. No discharged cartridges located at the scene were associated with the .40-caliber handgun found on Mandac's body.

### The underlying proceedings

The People charged Gonzalez by information with the murders of Casarez (Pen. Code, § 187, subd. (a); count 1) and Mandac (*ibid.*; count 2). With respect to both counts, the information alleged that Gonzalez personally used a firearm within the meaning of Penal Code section 12022.5, subdivision (a).[3] It was further alleged that counts 1 and 2

___

[3] The information also charged Sebastian with two counts of murder and alleged that he committed the crime of accessory

7

involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; Gonzalez had induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission; and the crimes were carried out in a manner that indicates planning, sophistication, or professionalism. Gonzalez pleaded not guilty to both counts and denied all special allegations.

A jury found Gonzalez guilty of the first degree murders of Mandac and Casarez. As to both counts, the jury also found true the allegation that Gonzalez personally used a firearm within the meaning of Penal Code section 12022.5, subdivision (a). The court sentenced Gonzalez to 25 years to life on count 1, plus 10 years for the firearm enhancement, for a total of 35 years to life. On count 2, the court imposed a concurrent sentence of 25 years to life, plus 10 years for the firearm enhancement.

Gonzalez timely appealed.

## DISCUSSION

## I.  The Trial Court Did Not Err in Overruling the Defense Objection to the Prosecutor's Peremptory Challenge

Gonzalez contends the trial court erred in overruling defense counsel's objection to a peremptory challenge the prosecutor exercised to remove a prospective African American juror. We find no error.

---

after the fact with knowledge of the crime (Pen. Code, § 32) and had been previously convicted of a serious or violent felony. The jury found him not guilty of the murders but guilty of being an accessory after the fact.

### A.     Background

***Juror No. 1589***

Potential jurors in this case received a questionnaire which asked for biographical information and posed questions relevant to the jurors' ability to be fair and impartial.  During voir dire, the court asked follow-up questions based on the questionnaire, as well as whether there was any reason the jurors believed they could not be fair and impartial.

Juror No. 1589's questionnaire indicated a close family member had been the victim of a crime, and he had "experiences with a law enforcement officer which would prevent [him] from judging a law enforcement witness by the same standard as any other witness."  Juror No. 1589 told the court that his cousin was shot and killed in 2005.  The police caught the perpetrator, but Juror No. 1589 was not satisfied with the way law enforcement handled the case.  He explained: "They left my cousin on the ground for, like, two hours before they came and checked on him.  So that really frustrate[d] the family."  He felt that law enforcement had improperly delayed in investigating the crime and tried "to blame us for doing it . . . ."  Although the shooting was gang-related, his cousin was not a gang member.  However, law enforcement "treated [his family] like [they were] gang members because [they] all lived in the same neighborhood," "[s]o it was kind of frustrating dealing with the police."  However, Juror No. 1589 was satisfied that the perpetrator had been convicted and sent to prison.

The court asked whether that experience would affect Juror No. 1589 in this case.  Juror No. 1589 replied: "It's kind of frustrating.  So I'm kind of bearded [*sic*] with the justice system.  So I don't know if I will be able to—"  The court interjected that,

9

as a juror, Juror No. 1589 would be part of the justice system and would get to decide the facts of the case and apply them to the law.  It asked whether he thought he could do that.  Juror No. 1589 replied: "I don't know."  The court asked whether he would try his best.  He replied that he would.  He then answered "yes" to a series of questions the court asked confirming that the juror would listen to the evidence and "be fair and impartial to both sides."

The court then inquired about the juror's experience with law enforcement as reported in response to the questionnaire. Juror No. 1589 explained that when he was 12 or 13 years old, he was playing basketball with friends when a police car pulled up and officers told the children to "put [their] hands on the hot hood" of the police car.  The officers beat the children's hands with a flashlight when they tried to move them.  This experience "kind of made [him] bitter."  When asked whether he would hold that experience against any officers that might testify, Juror No. 1589 replied: "I don't know.  I don't know."  The court explained that it would instruct the jury that the law states that an individual's status as a law enforcement officer does not permit a juror to assume that person is more or less credible than anyone else.  The court asked whether Juror No. 1589 would be able to follow that instruction.  He replied: "Yes."

Counsel for the defendants asked Juror No. 1589 several questions, but none pertained to his ability to be fair and impartial based on his experiences with law enforcement.  The prosecutor did not ask Juror No. 1589 any questions individually.

The prosecutor challenged Juror No. 1589 for cause.  He explained that Juror No. 1589 said "he was bitter about the way that his cousin's case, his murder case was handled, that he was

10

frustrated by the police.  Frustrated by the police, and at one point the court asked him, Do you think you can be fair to law enforcement?  And he said, I don't know, and I think he said that twice.  [¶]  And I want to also point out—and I think it was obvious as well—he became visibly emotionally upset during his discussion to the point where I think he had a hard time articulating—getting the words out of his mouth because he was so upset about it, just simply being able to recall it now.  He said . . . his cousin's case happened—I believe it was in the early two thousands.  We're roughly 20 years removed from that, and it's obvious that he still feels a great deal of emotional angst over the way his family was treated during that investigation."

Defense counsel suggested the juror was simply being honest and answering the questions with "deep introspection," while "everybody else just kind of says what they're supposed to say, like a quarterback being interviewed after a game."  The court denied the for cause challenge, stating: "I don't think it rises to for cause . . . ."

The prosecutor subsequently exercised a peremptory challenge against Juror No. 1589.  Counsel for defendants jointly made a *Batson/Wheeler* objection.  The court stated that it would instead entertain a challenge under section 231.7.  All counsel agreed Juror No. 1589 was an African American male.  The prosecutor argued that the reasons he articulated for removal for cause were race-neutral and he was continuing to assert those reasons.  Sebastian's counsel argued that Juror No. 1589's distrust of law enforcement was a presumptively invalid reason under the statute.  The prosecutor contended the presumption was overcome "in that the court specifically asked him, Can you be fair to law enforcement?  [¶]  And he said, I don't know.

11

[¶] . . . [¶]  He said it twice."  The court noted Juror No. 1589 eventually said he could be fair to the People.  The prosecutor argued this "strain[ed] credulity," as Juror No. 1589 had a "visceral response to this line of questioning" and his subsequent response "under pressure to say that . . . he can be fair" was not credible.

Gonzalez's attorney argued that Juror No. 1589's response "could very well be appropriate given what [Juror No. 1589] endured," which "probably very likely was because of his race . . . ."  Counsel for both defendants further argued that the bases for the prosecutor's challenge—negative experience with law enforcement and the juror's feeling that the police treated his family like gang members—were invalid reasons under the statute.  The court asked the prosecutor to "articulate beyond those two invalid reasons . . . why you are challenging him."

The prosecutor reiterated that "the court specifically asked him . . . [if] despite his bitterness, despite feeling frustrated, despite all of these negative feelings that he had experienced going through what he felt was mistreatment by law enforcement during his cousin's murder investigation, can he still then be fair to law enforcement?  And the court asked him twice, and he twice said, I don't know."  The prosecutor noted that the statute requires an inquiry into whether a prospective juror can be fair.  He asserted he challenged Juror No. 1589 because he "specifically told this court he is not sure whether or not he is capable of being fair to law enforcement."

Defense counsel argued the juror's experiences "seem to be likely because of race . . . ."  The court indicated it heard the juror answer the court's questions "of how he can treat the police officers," and noted, "I believe, however, that really derives from

12

his racial makeup . . . ."  The prosecutor countered that "[m]any people have had negative experiences with law enforcement" but "are capable of putting it aside."  He argued that Juror No. 1589's "emotional response and . . . two [']I don't know if I could be fair to law enforcement['] answers . . . crossed that barrier."

The court ultimately agreed the prosecutor had shown by clear and convincing evidence that an objectively reasonable person would view the prosecutor's rationale as unrelated to Juror No. 1589's membership in a cognizable group.  It therefore overruled the defense objection and excused Juror No. 1589.

***Further voir dire proceedings***

Another juror stated that she and her husband had been the victims of multiple crimes but her experiences would not affect her and there was no reason she could not be fair and impartial.  Defense counsel exercised a peremptory challenge against this juror.  The prosecutor made a section 231.7 objection and identified the juror as an African American female.  Defense counsel argued the juror had been the victim of several crimes but this had nothing to do with her race.  The court observed she was the second African American juror against whom defense counsel had exercised a peremptory challenge and concluded defense counsel had failed to identify a valid reason for excusing the juror when she "didn't give any indication that she would be biased."  The court sustained the prosecutor's objection under section 231.7.  Although no other jurors expressed distrust in law enforcement like Juror No. 1589, several were dismissed for cause by stipulation of both parties on the ground that the jurors expressed a doubt as to whether they could be fair or impartial.

### B.     Applicable legal principles

"The Legislature enacted section 231.7, effective in criminal

13

trials beginning January 1, 2022, to establish 'a new process for identifying unlawful bias in the use of peremptory challenges during jury selection' because studies showed that the existing *Batson/Wheeler* analysis[4] . . . was inadequate to prevent racial discrimination." (*People v. Jimenez* (2024) 99 Cal.App.5th 534, 539–540 (*Jimenez*).)

As relevant here, section 231.7, subdivision (a), states that "[a] party shall not use a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race . . . ." The party or court on its own motion may object to the improper use of a peremptory challenge under subdivision (a). (§ 231.7, subd. (b).) "The court shall evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances," considering only the reasons actually given. (*Id*., subd. (d)(1).) "If the court determines there is a substantial likelihood that an objectively reasonable person would view race . . . , as a factor in the use of the peremptory challenge, then the objection shall be sustained." (*Ibid*.)

---

4      "Claims of unconstitutional challenges of prospective jurors are governed by a framework established by *Batson v. Kentucky* (1986) 476 U.S. 79 . . . and *People v. Wheeler* (1978) 22 Cal.3d 258 . . . ." (*Jimenez, supra*, 99 Cal.App.5th at p. 547.) "Under a three-step process, a defendant must first ' "make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' " ' [Citation.]" (*Id*. at p. 548.) "Under the second step, ' " . . . the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." ' [Citation.]" (*Ibid*.) " ' "Third, '. . . the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' " [Citations.]' " (*Id*. at p. 549.)

14

Under section 231.7, "a 'substantial likelihood' means more than a mere possibility but less than a standard of more likely than not." (§ 231.7, subd. (d)(2)(B).) "[A]n objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California," and " 'unconscious bias' includes implicit and institutional biases." (*Id*., subd. (d)(2)(A), (C).) Section 231.7, subdivision (d)(3), provides a non-exhaustive list of circumstances the court may consider in the analysis.

Section 231.7, subdivision (e), provides, in part, that certain reasons given for the use of a peremptory challenge are "presumed to be invalid unless the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race . . . , and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." The presumptively invalid reasons include "[e]xpressing a distrust of or having a negative experience with law enforcement or the criminal legal system" and "[e]xpressing a belief that law enforcement officers engage in racial profiling or that criminal laws have been enforced in a discriminatory manner." (§ 231.7, subd. (e)(1)–(2).) Clear and convincing evidence to overcome the presumption exists when the court, "bearing in mind conscious and unconscious bias," determines "that it is highly probable that the reasons given for the exercise of a peremptory challenge are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on that juror's ability to be fair and impartial in the case." (*Id*., subd. (f).)

15

Section 231.7, subdivision (g), further provides that certain demeanor-based reasons for the exercise of a peremptory challenge "have historically been associated with improper discrimination in jury selection," including the claim that "[t]he prospective juror was inattentive, or staring or failing to make eye contact"; "exhibited either a lack of rapport or problematic attitude, body language, or demeanor"; or "provided unintelligent or confused answers." (§ 231.7, subd. (g)(1)(A)–(C).) These reasons are presumptively invalid "unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party" *and* "the counsel offering the reason shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (*Id*., subd. (g)(2).)

Section 231.7 "calls for de novo review of a trial court's decision to overrule an objection to a peremptory challenge, 'with the trial court's express factual findings reviewed for substantial evidence.' " (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 795 (*Ortiz*), quoting § 231.7, subd. (j).) "The statute also limits the bases upon which an appellate court may affirm the trial court's ruling. The appellate court 'shall not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record.' " (*Ortiz*, at p. 795, quoting § 231.7, subd. (j).) Further, "[t]he reviewing court shall consider only reasons actually given under subdivision (c) and shall not speculate as to or consider reasons that were not given to explain" the party's exercise of the peremptory challenge. (§ 231.7, subd. (j).)

**C. There was clear and convincing evidence that a reasonable person would view the prosecutor's rationale as unrelated to Juror No. 1589's race**

At present, only two published opinions have discussed the application of section 231.7, subdivision (e), in any depth. We examine both before turning to the facts before us.

In *Jimenez*, a Latina prospective juror expressed the view that the law was enforced differently based on race. (*Jimenez, supra,* 99 Cal.App.5th at p. 541.) When asked "if she would 'have a difficult time being fair and considering only the evidence that [is] presented' even if 'there's no evidence that's presented' regarding how race affects law enforcement," she stated: " 'I think it would be difficult. I'm not saying I couldn't do it. I also think that I—I also think implicit bias is definitely a thing that I could do without knowing I did it.' " (*Ibid.*) Similarly, when asked "whether 'it would be difficult' to give the testimony of the officers 'a fair shake,' she confirmed, . . . 'I feel like it could be one of those things where it's, like, always in the back of my mind as much as I try to set it aside.' " (*Ibid.*) A White female prospective juror expressed similar views. (*Ibid.*)

The prosecutor asserted a for cause challenge to the White juror. The court granted the request over a defense objection. (*Jimenez, supra,* 99 Cal.App.5th at p. 541.) The prosecutor then exercised a peremptory challenge to the Latina juror. (*Id.* at p. 542.) The defense objected under section 231.7. (*Ibid.*) The prosecutor offered a number of reasons for the challenge, including the juror's beliefs about the racial bias of law enforcement officers. (*Ibid.*) The prosecutor conceded this reason was presumptively invalid. (*Ibid.*) However, he argued that "clear and convincing evidence established that this reason was

17

unrelated to conscious or unconscious bias and instead 'bear[s] on that juror's ability to be fair and impartial in the case. . . .' " (*Ibid*.)  The trial court agreed and overruled the objection.  (*Id*. at pp. 542–543.)

On appeal, the *Jimenez* court found there was clear and convincing evidence to overcome the presumption of invalidity. (*Jimenez*, *supra*, 99 Cal.App.5th at p. 544.)  The prospective juror's "repeated acknowledgement that she would have difficulty setting aside her bias against law enforcement officers to fairly consider their testimony, despite her initial statements she could be fair" was an undisputed fact.  (*Ibid*.)  "An objectively reasonable person would view the prosecutor's challenge of Juror Number 8 due to her feelings on law enforcement as related to her ability to be fair based on her repeated acknowledgement that she would have difficulty setting aside her bias and being fair."  (*Ibid*.)  The prosecutor had also dismissed a White juror who expressed similar doubts about her ability to be fair.  (*Id*. at p. 545.)  In a footnote, the court explained, "[a]lthough having views that impair a prospective juror's ability to be fair is typically related to a challenge for cause [citation], by its terms, section 231.7, subdivision (e), renders the ability to be fair and impartial relevant to the exercise of a peremptory challenge for a presumptively invalid reason."  (*Id*. at p. 544, fn. 3.)  "Further, our Supreme Court also recognized that a basis for cause can be the same as a basis for a peremptory challenge."  (*Ibid*., citing *People v. Rhoades* (2019) 8 Cal.5th 393, 435.)

Because the presumption of invalidity was overcome, the *Jimenez* court proceeded to consider the prosecutor's stated reasons under the section 231.7, subdivision (d)(3), totality of the circumstances analysis.  (*Jimenez*, *supra*, 99 Cal.App.5th at

pp. 541, 545.) Under the totality of the circumstances, the court concluded "there is not a substantial likelihood that an objectively reasonable person would view cognizable group membership as a factor in the prosecutor's peremptory challenge of Juror Number 8. Rather, an objectively reasonable person would determine that the prosecutor exercised the challenge because of Juror Number 8's inability to be fair based on her view of law enforcement racial bias and her employment by a school district. He consistently sought to excuse or challenge prospective jurors who expressed a potential inability to be fair. . . . Finally, the prosecutor did not seek to remove all Latino prospective jurors." (*Id.* at pp. 546–547.)

In *People v. Uriostegui* (2024) 101 Cal.App.5th 271, the prosecutor used a peremptory challenge against a juror with a "Spanish surname" based on her lack of life experience, and, among other reasons, that she was not currently employed. (*Id.* at pp. 275, 276.) On appeal, the majority rejected the Attorney General's contention that " 'lack of life experience' " was not a presumptively invalid reason for excusing the juror, as it was based in part on the juror's lack of employment, which is a presumptively invalid reason under section 231.7, subdivision (e)(11). (*Id.* at pp. 279, 280.) The court noted the prosecutor had failed to make any showing that it was highly probable that an objectively reasonable person would view this reason as unrelated to the juror's perceived ethnicity. (*Id.* at p. 280.) The prosecutor further failed to make any showing that the juror's lack of employment bore on her ability to be fair and impartial. (*Ibid.*)

Here, the prosecutor moved to excuse Juror No. 1589 for cause because he expressed bitterness towards law enforcement

19

for its handling of his cousin's murder, was visibly emotional speaking about the situation to the point that he struggled to get words out, and indicated multiple times that he did not know whether he could be impartial towards law enforcement. The prosecutor argued these were race-neutral reasons that also justified his peremptory challenge.

It is undisputed that Juror No. 1589's negative experience with law enforcement was a presumptively invalid reason for the exercise of a peremptory challenge under section 231.7, subdivision (e). Thus, we consider whether the prosecutor showed by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to Juror No. 1589's race and that the reasons articulated bore on his ability to be fair and impartial in the case. That is, we consider whether "it is highly probable that the reasons given for the exercise of a peremptory challenge are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on that juror's ability to be fair and impartial in the case." (§ 231.7, subd. (f).)

The circumstances here are similar to those of *Jimenez*, and we find the case instructive. As the court in *Jimenez* observed, "[t]he statute does not limit our ability to consider undisputed facts in the record that are relevant to the prosecutor's reason or the court's finding during our de novo review." (*Jimenez, supra*, 99 Cal.App.5th at p. 544.) Here, as in *Jimenez*, one such undisputed fact is Juror No. 1589's "repeated acknowledgement that [he] would have difficulty setting aside [his] bias against law enforcement officers to fairly consider their testimony . . . ." (*Ibid*.)

20

Juror No. 1589 expressed frustration with law enforcement's handling of his cousin's murder case, and doubt as to whether he could keep that experience from influencing his decisions as a juror. Specifically, when asked whether he could decide the facts of the case and apply them to the law, he said, "I don't know." After further questioning from the court, he stated that he would try his best. Similarly, in connection with his childhood experience of being stopped and mistreated by police officers, Juror No. 1589 stated that the experience "kind of made [him] bitter" and twice replied "I don't know" when asked whether he would hold that experience against any officers that might testify. Only after the court told him that he would be instructed not to give law enforcement officers "more or less credibility" than anyone else did he agree that he could follow the instruction.

We acknowledge that in *Jimenez*, the reason for the juror's views regarding law enforcement racial bias were not expressly stated (see *Jimenez, supra,* 99 Cal.App.5th at p. 541), whereas Juror No. 1589's views appeared to be the direct result of how law enforcement had treated him personally, both in connection with his cousin's murder and when officers stopped him as a child. There was thus reason to believe Juror No. 1589's views arising from his past experiences were related to his race.

We nevertheless conclude that "[a]n objectively reasonable person would view the prosecutor's challenge of Juror Number [1589] due to [his] feelings on law enforcement as related to [his] ability to be fair based on [his] repeated acknowledgement that [he] would have difficulty setting aside [his] bias and being fair." (*Jimenez, supra,* 99 Cal.App.5th at p. 544.) While a prospective juror's negative experience with law enforcement may be

21

inextricably related to that juror's race, the focus of section 231.7 is on race as a factor in the use of the peremptory challenge. In view of his multiple uncertain and noncommittal responses regarding impartiality, the trial court properly found it highly probable the prosecutor's challenge was unrelated to conscious or unconscious bias and was instead specific to Juror No. 1589 and bore on his ability to be fair and impartial. In other words, the clear and convincing standard was satisfied.

Gonzalez contends that we must also analyze the prosecutor's challenge under section 231.7, subdivision (g). We disagree. It is clear from the record that the prosecutor's comments on Juror No. 1589's demeanor did not constitute an independent justification for his peremptory challenge but were intended to support his challenge on the ground that Juror No. 1589 expressed doubt about remaining impartial in light of his negative interactions with law enforcement. Specifically, the prosecutor argued that Juror No. 1589 was "visibly emotionally upset during his discussion" of what his family experienced, to the point that he had difficulty "articulating—getting the words out of his mouth," which suggested "he still feels a great deal of emotional angst over the way his family was treated during that investigation." The prosecutor did not suggest that Juror No. 1589's emotion was a "problematic attitude, body language, or demeanor" in the abstract, or that he provided "unintelligent or confused answers." (§ 231.7, subd. (g)(1)(B)–(C).) The prosecutor further did not indicate the juror's difficulty in responding to questions was a concern beyond the extent to which it reflected his negative feelings towards law enforcement and called into question his ability to be impartial. (*Id*., subd. (g)(1)(B).)

Gonzalez contends *Ortiz, supra,* 96 Cal.App.5th 768, compels the conclusion that the prosecutor's rationale was presumptively invalid under section 231.7, subdivision (g), since the trial court did not confirm his observations or require further explanation. *Ortiz* provides a helpful contrast, but does not mandate a particular result in this case.

In *Ortiz,* the prospective jurors were asked to complete a four-page questionnaire. S.H., an African American prospective juror, left an entire page blank, even though "the trial court emphasized that all four pages must be completed." (*Ortiz, supra,* 96 Cal.App.5th at p. 784.) After questioning by the court and counsel, the prosecutor exercised a peremptory challenge against S.H. (*Id.* at p. 788.) She argued S.H. " 'was not able to answer or understand some very basic questions,' " " 'seemed easily confused or unable to answer questions,' " left a questionnaire page blank, and was " 'soft-spoken, reluctant and timid . . . .' " (*Id.* at p. 789.) The trial court confirmed the prosecutor's observations regarding demeanor and asked the prosecutor "to 'explain why the evasiveness matters.' " (*Id.* at pp. 790, 789.) The prosecutor cited her inability to ascertain whether S.H. was being truthful or hiding bias. (*Id.* at p. 790.) The trial court granted the peremptory challenge. (*Id.* at p. 791.) The Court of Appeal affirmed, concluding substantial evidence supported the trial court's findings in the confirmation stage (*id.* at pp. 801–803) and the prosecutor's reasons fulfilled the explanation requirement of section 231.7, subdivision (g)(2). (*Id.* at pp. 804–805.)

Thus, in *Ortiz,* the justification for the prosecutor's peremptory challenge was the *manner* in which S.H. responded (or failed to respond) to questions. The content of S.H.'s answers

23

did not cause the prosecutor to believe he lacked impartiality; instead, his confusion and evasiveness left her unable to make an assessment. The prospective juror's demeanor and inability or unwillingness to answer questions were, standing alone, the prosecutor's reasons for exercising the challenge. In contrast, the prosecutor here described Juror No. 1589's expression of emotion to contextualize a challenge based on the *substance* of Juror No. 1589's responses, namely his express doubts about his ability to be fair. Under these circumstances, we disagree that the prosecutor's reference to Juror No. 1589's emotion when answering a question must be construed as an independent, presumptively invalid, demeanor-based reason for the challenge under section 231.7, subdivision (g).[5]

---

[5] After this matter was submitted, *People v. Caparrotta* (July 16, 2024, D083314) ___ Cal.App.5th ___ [2024 Cal.App. Lexis 456] was certified for publication. *Caparrotta* also does not compel the conclusion that the prosecutor's statements should be construed as a demeanor-based reason for his challenge. In *Caparrotta*, defense counsel exercised peremptory challenges to two White, female jurors based on the first juror's body language and " 'law enforcement connections' " and the second juror's "inability to pay attention, . . . to be seated, and to impartially listen to the evidence . . . ." (*Id*. at ___ [pp. *13, 15, 12–16].) The trial court disagreed with defense counsel's observations and sustained the section 231.7 challenges. (*Id*. at ___ [pp. *12–16].) The Court of Appeal affirmed, concluding, inter alia, defense counsel's reasons were conclusively invalid under section 231.7, subdivision (g), because the court did not confirm the behaviors used to justify the challenges. (*Id*. at pp. ___ [pp. *21–22, 34].) As in *Ortiz*, claims about the jurors' demeanors were the primary grounds for the challenges. Further, defense counsel in *Caparrotta* did not claim that the first juror's body language bore

24

Further considering the prosecutor's challenge in light of section 231.7, subdivision (d)(3)(A) through (G), we find no error in the court's order overruling the objection. Juror No. 1589 is not a member of the same cognizable group as Gonzalez. (§ 231.7, subd. (d)(3)(A)(i).) Gonzalez, Sebastian, Gaeta, Kathy H., and Detectives Armenta and Fernandez have Spanish surnames and may be perceived as Latino or Latina. There is no indication in the record that any person involved in the case was African American. (*Id*., subd. (d)(3)(A)(ii)–(iii).) It does not appear race or ethnicity bore on the facts of the case. (*Id*., subd. (d)(3)(B).) Although the prosecutor did not question Juror No. 1589 about his feelings towards law enforcement, the court did so at some length, and the prosecutor did not question any juror on this subject. (*Id*., subd. (d)(3)(C)(i), (iii).) No other juror provided the same response as Juror No. 1589 regarding law enforcement (*id*., subd. (d)(3)(D)), but other jurors who expressed doubts as to their ability to remain fair and impartial were dismissed for cause with the prosecutor's agreement.

We conclude, as did the court in *Jimenez*, that we need not consider again here whether the prosecutor's challenge "might be disproportionately associated with" a cognizable group. (§ 231.7, subd. (d)(3)(E).) The court in *Jimenez* observed that, although "[i]t is true that Juror Number 8's belief that race affects how the law applies 'might be disproportionately associated with' a cognizable group . . . the Legislature placed this reason into the category of presumptively invalid reasons because it was disproportionately associated with protected groups. [Citation.]" (*Jimenez*, *supra*, 99 Cal.App.5th at p. 546.) Because the court

---

any relationship to the justification based on her law-enforcement connections.

25

"already determined that . . . there was clear and convincing evidence that this reason bore on Juror Number 8's ability to be fair and impartial," it declined to consider this circumstance again. (*Ibid.*) We decline to consider the circumstance again for the same reasons. Our prior conclusion also demonstrates that the prosecutor's challenge was supported by the record. (§ 231.7, subd. (d)(3)(F).) Finally, there is no indication in the record that the prosecutor used peremptory challenges disproportionately against African American jurors in this or prior cases. (*Id.*, subd. (d)(3)(G).) The record does not indicate that the prosecutor used a peremptory challenge against any other African American juror, and he objected to defense counsel's peremptory challenge to a prospective juror he and the court perceived as African American, who had expressed no hesitation regarding her ability to be impartial.

Under the totality of the circumstances, we conclude there is no substantial likelihood that an objectively reasonable person would view cognizable group membership as a factor in the prosecutor's use of a peremptory challenge to remove Juror No. 1589. Rather, an objectively reasonable person would determine that the prosecutor exercised the challenge because of the prospective juror's inability to be fair and impartial, as suggested by his own acknowledgement that he did not know if he could evaluate all testimony fairly. (*Jimenez, supra*, 99 Cal.App.5th at p. 546.) The trial court did not err in overruling the section 231.7 objection.

[[Begin nonpublished portion.]]

26

## II. The Trial Court Did Not Err in Admitting Portions of the Law Enforcement Interview of Gonzalez

Gonzalez contends the trial court violated his Fifth Amendment right against self-incrimination and Fourteenth Amendment right to due process by allowing the prosecution to introduce recorded statements he made to law enforcement without receiving *Miranda* advisements. We conclude that Gonzalez was not in custody within the meaning of *Miranda* when he spoke with law enforcement.

### A. Background

Before trial, Gonzalez filed a motion in limine to exclude a recorded statement he made to detectives at the hospital. He argued the interview violated his expectation of privacy and the statements were the product of custodial interrogation obtained without a *Miranda* waiver.

During a pretrial hearing, Detective Armenta testified about the circumstances of Gonzalez's statements. Armenta was assigned to the murders of Mandac and Casarez. He spoke with Gonzalez at the hospital on July 4, 2021. Gonzalez was not under arrest at the time and was not arrested that day. Armenta questioned Gonzalez in a patient room at the hospital and recorded the interview.

On cross-examination, Armenta testified that he stood near the foot of the bed when questioning Gonzalez. He did not get a warrant to enter the room nor did he ask Gonzalez's permission to do so. He also did not ask Gonzalez for permission to record their conversation. Armenta did not ask doctors about Gonzalez's condition or what medications he might be on. Gonzalez remained in bed when the officers questioned him. Armenta testified that he and Gonzalez were the same distance from the

door.  Armenta's partner, Detective Fernandez, was the only other law enforcement officer present with him.  Armenta wore a suit and identified himself as a detective.  He had a firearm concealed under his suit jacket.

Armenta and his partner went to the hospital because he had been informed that another victim had been shot.  Armenta and Fernandez asked for and received permission from hospital staff to enter the patient room.  There were nurses and doctors around the room while Armenta and Fernandez questioned Gonzalez.  Gonzalez was arrested four days after the hospital interview.

Gonzalez's counsel argued that the questioning in the hospital room violated Gonzalez's right to privacy and violated both his Fourth and Fifth Amendment rights.  The trial court disagreed, noting that people enter hospital rooms all the time, and there is no reasonable expectation of privacy in a hospital room when someone enters with the permission of hospital staff.  The court concluded that Gonzalez was not under arrest or in custody, the detectives were not required to give him a *Miranda* warning, and there was no expectation of privacy since hospital staff gave the detectives permission to enter.

### B.    Applicable legal principles

"The Fifth Amendment provides that '[n]o person . . .  shall be compelled in any criminal case to be a witness against himself.'  [Citations.]"  (*People v. Jackson* (2016) 1 Cal.5th 269, 338.)  "To safeguard a suspect's Fifth Amendment privilege against self-incrimination from the 'inherently compelling pressures' of custodial interrogation," law enforcement officers must "advise an accused of his right to remain silent and to have

counsel present prior to any custodial interrogation . . . .” (*Id*. at pp. 338–339, quoting *Miranda*, *supra*, 384 U.S. 436.)

However, a *Miranda* advisement “is only required when a person is subjected to custodial interrogation. [Citation.] Custodial interrogation has two components. First, it requires that the person being questioned be in custody. . . . The second component of custodial interrogation is obviously interrogation. For *Miranda* purposes, interrogation is defined as any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response.” (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088, 1089 (*Mosley*).)

“An interrogation is custodial when ‘a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.’ [Citation.] Whether a person is in custody is an objective test; the pertinent inquiry is whether there was ‘ “ ‘a “formal arrest or restraint on freedom of movement” of the degree associated with a formal arrest.’ ” ’ [Citation.]” (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400 (*Leonard*).) “As the United States Supreme Court has instructed, ‘the only relevant inquiry is how a reasonable man in the suspect’s shoes would have understood his situation’ ”—that is, “whether a reasonable person in defendant’s position would have felt he or she was in custody.” (*People v. Stansbury* (1995) 9 Cal.4th 824, 830.)

“To determine whether an interrogation is custodial we consider a number of circumstances, including: ‘whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect;

29

where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation.' [Citation.]" (*People v. Torres* (2018) 25 Cal.App.5th 162, 172–173.) No single factor is dispositive. (*Id*. at p. 173.)

"Whether a defendant was in custody for *Miranda* purposes is a mixed question of law and fact. [Citation.] When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*Leonard*, *supra*, 40 Cal.4th at p. 1400.)

### C. The interrogation was not custodial

Gonzalez argues he was subjected to an unlawful custodial interrogation. We conclude that the interview was not custodial

30

and Gonzalez's Fifth Amendment rights were not violated.[6]

We are guided by several cases that have assessed whether interrogations occurring in medical environments were custodial. For example, in *Mosley*, *supra*, 73 Cal.App.4th 1081, the court considered "whether a person who is in the physical custody and care of medical personnel such as paramedics and who is being treated in an ambulance for a gunshot wound at the time of an interview with a police officer should be considered to also be 'in custody' for purposes of triggering the requirements of the *Miranda* decision." (*Id*. at p. 1089.) A law enforcement officer questioned the defendant about how he had come to be shot while the defendant was being treated in an ambulance at the scene of the crime. (*Id*. at p. 1085.)

Division Five of this District concluded the defendant was not in custody within the meaning of *Miranda* when he was questioned. (*Mosley*, *supra*, 73 Cal.App.4th at pp. 1090–1091.) The court observed that "[a]ny restraint of defendant's freedom of action was caused by the need to treat his gunshot wound, which was still bleeding and was actively being treated during the interview"; "[h]e had not been placed under arrest because the police did not know what had happened that caused him to be shot"; "the interview was in view of and in the presence of medical personnel who continued to treat defendant during the brief interview"; and "the questioning was not accusatory or threatening, [the] defendant was not handcuffed, . . . no guns were drawn, and [the] defendant was about to be transported to a hospital and not to a police station or jail." (*Id*. at p. 1091.) The court therefore concluded that, under the totality of the

---

[6] The Attorney General does not dispute that the questioning at the hospital was an interrogation.

31

circumstances, "a reasonable person in defendant's position would not have believed he was in police custody and that no *Miranda* rights were required prior to questioning." (*Ibid.*)

Courts in other jurisdictions have reached the same conclusion under similar facts. In *U.S. v. Berres* (10th Cir. 2015) 777 F.3d 1083, 1092 (*Berres*), the defendant identified a number of factors that he argued indicated he was in custody during questioning at a hospital, including that "[h]e was apparently not made aware that he was free to leave," "[t]he questioning related to a potential crime committed by him," and the "the questioning took place in a 'police[-]dominated' atmosphere." The court disagreed. (*Ibid.*) It observed that the defendant "was at the hospital on his own request"; "was not told he was in custody, nor was he physically restrained in any way"; "appeared calm, was completely willing to discuss the contents of his bag, and never sought to end the interview"; and the officer "was not aggressive or confrontational during his questioning . . . ." (*Ibid.*) The court also disputed the defendant's characterization of the room as police-dominated. (*Ibid.*) Even though three officers introduced themselves to the defendant, only one was present for the vast majority of the interview, and all officers were in plain clothes with no weapons displayed. (*Ibid.*)

Similarly, in *U.S. v. Infante* (1st Cir. 2012) 701 F.3d 386, 396–397, the court concluded that a hospital interrogation was not custodial where the detective "repeated to [the defendant] several times that the interview was voluntary . . . and that [the defendant] was not under arrest or in custody"; "[t]he officers who were present did not make physical contact with [the defendant], nor did they impede hospital personnel from coming and going freely"; "[t]he interviews were relatively short"; the officers "were

32

in plainclothes and their weapons remained in their holsters"; "[t]he atmosphere was non-confrontational"; and, the defendant "was coherent and responsive, showing no sign of mental impairment."

Here, although Gonzalez's gunshot injuries restricted his freedom of movement, the detectives did nothing to further restrain him. They stood at the foot of his bed and were the same distance from the door as Gonzalez. They wore plain clothes and did not display their weapons. Doctors and nurses were present during the questioning. The interview was brief. The detectives did not mention the deaths of Mandac and Casarez and inquired exclusively about how Gonzalez had been shot. Their questioning was not aggressive. Gonzalez responded coherently. While there is no evidence that the detectives informed Gonzalez that he was free to terminate the interview, there was also no evidence that he expressed any unwillingness to speak with the detectives or sought to end the interview. The detectives did not arrest Gonzalez at the conclusion of the interview.

Under the totality of the circumstances, we conclude a reasonable person in Gonzalez's position would have felt free to end the questioning. The circumstances here are similar to those present in *Mosley*, *supra*, 73 Cal.App.4th 1081 and *Berres*, *supra*, 777 F.3d 1083, which Gonzalez does not meaningfully distinguish. He instead argues that these decisions "have shortchanged the inherent coerciveness in being confined to a hospital bed where the person cannot physically leave." We disagree.

Gonzalez also cites *People v. Caro* (2019) 7 Cal.5th 463 (*Caro*) for the proposition that our Supreme Court "has recognized the potential for coerciveness in a situation where the

suspect is confined to a hospital bed." *Caro* does not support Gonzalez's argument here. As an initial matter, in *Caro*, the court declined to determine whether the law enforcement questioning at issue violated the defendant's constitutional rights, concluding instead that any error in admitting the challenged statements was harmless beyond a reasonable doubt. (*Id.* at p. 493.) At most, the court suggested the detective "tread on perilous ground" by intermittently questioning the hospitalized defendant for two and a half hours before administering *Miranda* warnings. (*Id.* at p. 492.) The defendant was in an intensive care unit and had just undergone brain surgery hours before; she was in significant pain; there was constant law enforcement presence in the room; hospital staff appeared to believe they could not interfere with the interview; and the defendant was isolated from friends and family. (*Id.* at pp. 492–493.)

In contrast, here, the record indicates the detectives questioned Gonzalez for under 10 minutes. There is no evidence that Gonzalez's mental faculties were in any way impaired when he spoke with the detectives. Medical personnel were in Gonzalez's hospital room during the questioning. There was no evidence that the detectives prevented Gonzalez's family from accessing him. At no point did the detectives question Gonzalez about the murders of Mandac and Casarez. Thus, *Caro* does not compel the conclusion that the interrogation in this case was custodial.[7]

---

[7] The Attorney General contends that Gonzalez's claim that his right to privacy was violated is meritless. Gonzalez appears to have abandoned this argument on appeal, as he mentions the

34

## III. Substantial Evidence Did Not Support an Imperfect Self-Defense Instruction

Gonzalez contends the court committed reversible error in failing to instruct the jury on imperfect self-defense. We disagree. Substantial evidence did not support the instruction.

### A. Background

In his opening arguments, counsel for Gonzalez argued the evidence would show that Gonzalez and Gaeta had been "set up to die" by Mandac and Casarez and that they only survived thanks to "quick thinking" and Gaeta "being able to sniff out the setup." Counsel for Sebastian similarly argued that Gonzalez acted in self-defense and that Gonzalez and Gaeta were victims of a setup. Gonzalez and Sebastian did not testify at trial.

At the close of evidence, Gonzalez's counsel requested instructions on voluntary manslaughter, self-defense, imperfect self-defense, and heat of passion. The court expressed doubt that there was evidence to support the self-defense instruction, especially as the defendants did not testify. Eventually, the court agreed to instruct the jury on perfect self-defense but denied the request for an imperfect self-defense instruction. Defense counsel did not object to this ruling. The court also instructed the jury on voluntary manslaughter under the sudden quarrel or heat of passion theory (CALCRIM No. 570) and provocation (CALCRIM No. 522).

_____

expectation of privacy only in the background section of his opening brief. In any event, we agree that the contention is without merit. (See *In re M.S.* (2019) 32 Cal.App.5th 1177, 1187 [" '[N]o Fourth Amendment violation occurs when a nurse permits an officer to enter a sentient patient's hospital room for purposes unrelated to a search, [and] the patient does not object to the visit.' [Citation.]"].)

During closing arguments, Gonzalez's counsel argued that self-defense did not require that Casarez fired first and that Gonzalez had the right to shoot in self-defense as soon as Mandac emerged from the bedroom, as his presence indicated a setup.

### B. Applicable legal principles

"An instance of imperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death. [Citation.] Imperfect self-defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself. [Citation.] It is well established that imperfect self-defense is not an affirmative defense. [Citation.] It is instead a shorthand way of describing one form of voluntary manslaughter. [Citation.] Because imperfect self-defense reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, this form of voluntary manslaughter is considered a lesser and necessarily included offense of murder." (*People v. Simon* (2016) 1 Cal.5th 98, 132 (*Simon*).)

"A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. [Citation.] Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense. [Citations.] [¶] We review de novo a trial court's decision not to give an imperfect self-defense instruction." (*Simon*, *supra*, 1 Cal.5th at pp. 132–133.)

Neither perfect nor imperfect self-defense may "be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*People v. Valencia* (2008) 43 Cal.4th 268, 288.)

### C.    Discussion

In this case, there was no evidence from which a jury composed of reasonable persons could find Gonzalez acted in imperfect self-defense. (*People v. Schuller* (2023) 15 Cal.5th 237, 262.) Kathy H. provided the only testimony about the events leading to the shooting. Her testimony indicated that Casarez, Mandac, and Gaeta had reached an understanding while Gonzalez remained outside. As soon as Gonzalez met Mandac and learned he was a member of the Rancho San Pedro gang, Gonzalez grew angry, rejected the agreement reached by the other men, and repeatedly told Mandac he was not wanted there, even as Mandac attempted to de-escalate the situation. Kathy H.'s testimony established that the shooting began outside, while Casarez remained inside next to Kathy H.

The physical evidence was consistent with Kathy H.'s testimony. Mandac's body was located near the entrance of the house. Although he was armed, he had no opportunity to draw his gun from its holster before he was shot multiple times. Four of the casings recovered from the scene came from Casarez's gun, meaning that Casarez had the opportunity to draw his gun and fire before he was killed. This is consistent with testimony that he had remained inside the house and was further from Gonzalez and Gaeta than Mandac, as well as body-worn camera footage showing that Casarez's body was located behind a couch in the

37

living room. The remaining 16 casings located at the scene came from two different guns that were not recovered by law enforcement. Mandac and Casarez were shot 16 times in total. Thus, as the Attorney General points out, every single bullet Gonzalez and Gaeta fired struck the victims.

There was no evidence that Gonzalez acted out of actual but unreasonable fear in this case. The prosecution's evidence did not create any such inference and the defense offered no evidence. The circumstances here are thus similar to those in *Simon*. In *Simon*, the victim and his fiancée were visiting the victim's cousin and her boyfriend, Curtis Williams, when the defendant arrived at the cousin's house. (*Simon*, *supra*, 1 Cal.5th at p. 108.) When the defendant learned that the victim was a member of a rival gang, the defendant grew angry and started cursing at the victim, who tried to de-escalate the situation. (*Ibid*.) Two witnesses stated that the defendant told his friends to go get his gun. (*Ibid*.) The victim's cousin asked the defendant to leave and Williams tried to usher the defendant outside. (*Ibid*.) The defendant then asked to use the restroom and when he came out, appeared to have calmed down. (*Id*. at pp. 108–109.) The defendant and Williams later exited the apartment. (*Id*. at p. 109.) The victim followed to check on Williams. (*Ibid*.) Witnesses then heard three gunshots. (*Ibid*.)

The Supreme Court concluded there was not substantial evidence to support an imperfect self-defense instruction. (*Simon*, *supra*, 1 Cal.5th at p. 133.) It observed that the evidence, "though hardly pellucid," suggested the defendant was the aggressor. (*Ibid*.) The record was also devoid of any evidence concerning the defendant's subjective fear. (*Id*. at pp. 133–134.) The defendant "did not testify, and there is no evidence he ever

told anyone that he had acted out of fear." (*Id*. at p. 134.) The court rejected the argument that the trial court was required to instruct the jury on imperfect self-defense because it had instructed the jury on perfect self-defense. (*Ibid*.)

Unlike the victim in *Simon*, the evidence here was that Mandac and Casarez were armed. However, there was no evidence that Gonzalez was aware of this before he instigated the conflict. Mandac's gun was still in its holster when his body was located by officers. Kathy H. also testified that Casarez remained inside the house, next to her, she could not see what was happening outside from where she stood, and she did not see Casarez with a gun that evening. As Gonzalez did not participate in the conversation that took place inside, the jury could not reasonably infer that he would have known whether Casarez was armed.[8]

The evidence further indicated that Mandac tried to de-escalate the situation like the victim in *Simon*. There was no evidence that either Mandac or Casarez threatened Gonzalez or Gaeta. Gonzalez did not testify and there was no testimony from any other person to support the theory that Gonzalez harbored a subjective fear of Mandac or Casarez. Indeed, when asked about his injuries in the hospital, Gonzalez did not describe being in imminent danger from Mandac or Casarez, but instead told detectives he was the victim of an entirely different shooting.

---

[8] For similar reasons, we agree with the Attorney General that the presence of a gun cleaning kit on one of the couches inside the home is not substantial evidence supporting the imperfect self-defense instruction. There is no evidence to support that Gonzalez saw the kit before shooting Mandac outside of the house.

Gonzalez contends that we should ignore Kathy H.'s testimony because we must view the evidence in the light most favorable to him. While " ' "[d]oubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused" ' " (*People v. Steskal* (2021) 11 Cal.5th 332, 345 (*Steskal*)), this general principle does not permit us to ignore uncontradicted evidence that is unfavorable to the defendant, or to substitute speculation for evidence. (See *Simon*, *supra*, 1 Cal.5th at pp. 108–109, 133 [court's conclusions based on eyewitness testimony, despite contradictions and the absence of a "pellucid" narrative of what occurred].) Here, the only evidence of what occurred was uncontradicted.

Gonzalez further contends that he "is not aware of any rule requiring the defendant to testify as a prerequisite to an instruction on self-defense or imperfect self-defense." The issue, however, is not whether the defendant testifies, but is instead whether there is *evidence*, in any form, from which a jury could reasonably conclude that the defendant perceived the victim "posed a risk of imminent peril." (*Simon*, *supra*, 1 Cal.5th at p. 133.) Thus, decisions issued by our high court, including *Simon*, have considered the lack of a defendant's testimony concerning subjective fear in concluding substantial evidence did not support an imperfect self-defense instruction. (See *Steskal*, *supra*, 11 Cal.5th at pp. 346–347 [no evidence requiring imperfect self-defense instruction where defendant did not testify, no evidence he told anyone he acted out of fear, there was evidence defendant was aggressor, and defendant fired on law enforcement officer before he could access his weapon].)

In *People v. Manriquez* (2005) 37 Cal.4th 547, for example, our high court concluded the record was "devoid of evidence

suggesting that . . . [the defendant] harbored an actual belief in the need for self-defense against an imminent danger to life or great bodily injury" where he "made no claim of ever having seen [the victim] armed with any weapon, said nothing about believing [the victim] was armed, and never indicated he felt he was under any imminent threat of death or great bodily injury when he drew the firearm from his waistband." (*Id.* at pp. 581, 582; see also *Simon*, *supra*, 1 Cal.5th at p. 133 [evidence that defendant was the aggressor, defendant did not testify, record was devoid of evidence tending to show his subjective fear of victim].)

Accordingly, we conclude the trial court did not err in denying Gonzalez's request for an imperfect self-defense instruction.

## IV. The Prosecutor Did Not Commit Misconduct by Commenting on the Attainability of the Proof Beyond a Reasonable Doubt Standard

Although his trial counsel failed to object, Gonzalez contends that he was prejudiced by the prosecutor's statement that the proof beyond a reasonable doubt standard is satisfied every day in courts across the country. We conclude that the prosecutor's statements were not improper and, in the alternative, any error was harmless.

### A. Background

At the opening and conclusion of trial, the court instructed the jury on the burden of proof, explaining that a defendant in a criminal case is presumed to be innocent and this presumption requires the People to prove a defendant guilty beyond a reasonable doubt.

In his closing argument, the prosecutor argued that circumstantial evidence "means you take two pieces of

41

information, direct pieces, direct evidence . . . and you make a reasonable conclusion about what those things mean." He stated: "[T]his is stuff all of us do on a daily basis. This is common sense stuff." He did not discuss the reasonable doubt standard but urged that there was only one reasonable conclusion that could be reached in light of all of the evidence: "that's [*sic*] Sebastian Gonzalez and Eric Gonzalez planned a murder."

Counsel for Gonzalez discussed the reasonable doubt standard at length during closing argument. He stated: "This is unlike the decisions we make every day. We cannot just go with what seems likely or even very likely. It must leave you with an abiding lasting conviction that the charges were true beyond all reasonable doubt. We very, very rarely make such decisions."

During his rebuttal argument, the prosecutor stated that he had proven the case beyond a reasonable doubt, that there is "nothing mythical about this standard of proof," and that, despite being "the highest standard of proof in this—in our system of justice," it "is met every day in courts throughout this country, hundreds of times, thousands of times on a daily basis." Defense counsel did not object.

## B.    Applicable legal principles

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but

42

is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 298 (*Riggs*).)

### C.    The prosecutor's statements were not improper

Gonzalez acknowledges that his attorney failed to object to the prosecutor's reasonable doubt argument. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 [timely and specific objection is required to preserve a claim of prosecutorial misconduct for appeal].) However, he argues that if the argument is forfeited, he received ineffective assistance of counsel. We exercise our discretion to address the claim on the merits to eliminate the need to address the ineffective assistance of counsel claim. (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1014.)

Gonzalez points out that no published California decision has addressed the propriety of an argument that the burden of proof in criminal cases is met every day in courts around the country. Yet he concedes that the only published decisions addressing this argument have rejected his contention that this prosecution argument is improper. In *People v. Laugharn* (Ill.Ct.App. 1998) 698 N.E.2d 219, 222, the court concluded the statement that the proof beyond a reasonable doubt standard is neither a mythical nor unattainable standard was not erroneous, as "[t]he average jury understands the concept of reasonable doubt and is not contaminated when it hears the prosecutor say that *reasonable* doubt has *reason* behind it, and is an attainable standard, which incidentally, are accurate statements." (See also *People v. Kidd* (Ill. 1996) 675 N.E.2d 910, 929 [challenge to argument "that the burden of proof beyond a reasonable doubt 'is

43

a burden of proof that is met in courtrooms across this county and in this building each and every day' " had been waived and, alternatively, was meritless].)

Gonzalez contends that the United States Supreme Court reached a different conclusion in *Taylor v. Kentucky* (1978) 436 U.S. 478 (*Taylor*). We disagree with this characterization of *Taylor*. There, "the trial court instructed the jury as to the prosecution's burden of proof beyond a reasonable doubt, but refused petitioner's timely request for instructions on the presumption of innocence and the indictment's lack of evidentiary value." (*Id*. at p. 479.) The United States Supreme Court reversed an order affirming the judgment. (*Id*. at p. 483.) It observed that the trial court's instructions were "Spartan" and the prosecutor asked the jury to draw inferences about the defendant's conduct from facts not in evidence. (*Id*. at p. 486.) Among other things, the prosecutor "described the reasonable-doubt standard by declaring that [the defendant], '*like every other defendant* who's ever been tried who's in the penitentiary or in the reformatory today, has this presumption of innocence until proved guilty beyond a reasonable doubt.' " (*Ibid*.) The prosecutor thereby "linked [the defendant] to every defendant who turned out to be guilty and was sentenced to imprisonment." (*Id*. at pp. 486–487.) In this context, "the trial court's refusal to give [the defendant's] requested instruction on the presumption of innocence resulted in a violation of his right to a fair trial as guaranteed by the Due Process Clause of the Fourteenth Amendment." (*Id*. at p. 490.)

Unlike the trial court in *Taylor*, the court here properly instructed the jury on the presumption of innocence on both occasions it instructed the jury on the burden of proof. Gonzalez

44

does not contend that the jury instructions here were skeletal or otherwise insufficient, nor does he assert the prosecutor's argument was in other ways misleading or improper, as was the case in *Taylor*. Moreover, the prosecutor's statement about the attainability of the standard of proof in this case did not "link[ ] [Gonzalez] to every defendant who turned out to be guilty and was sentenced to imprisonment." (*Taylor*, *supra*, 436 U.S. at pp. 486–487.)

We conclude the prosecutor's statement did not constitute misconduct. The prosecutor argued that people make decisions about circumstantial evidence in their daily lives but did not argue that people apply the beyond a reasonable doubt standard every day to make trivial decisions. (Cf. *People v. Nguyen* (1995) 40 Cal.App.4th 28, 35 (*Nguyen*).) Rather, he acknowledged that it is the highest standard of proof in our judicial system, while also arguing the proof beyond a reasonable doubt standard is applied daily *in courts* and many defendants are convicted. These statements were not inaccurate and did not trivialize the standard. They further did not encourage the jury to disregard the presumption of innocence.

Finally, even if the statements were improper, we would conclude any error was harmless and Gonzalez suffered no prejudice. The prosecutor's statement was brief. As noted above, the court correctly instructed the jury on the standard on multiple occasions. We presume the jury followed the court's instruction. (*Nguyen*, *supra*, 40 Cal.App.4th at p. 37.) Moreover, counsel for Gonzalez argued to the jury at length that the standard was not one they employed in their day-to-day lives. We cannot conclude either the fairness or outcome of the trial

45

"was affected to any significant degree." (*Riggs, supra*, 44 Cal.4th at p. 301.)

## V.  The Court Erred in Imposing the Upper Term for the Firearm Enhancements Without Making the Requisite Findings

Gonzalez contends, and the Attorney General concedes, that the trial court failed to find the aggravating factors alleged in the information true beyond a reasonable doubt and therefore erred in imposing the upper term sentence of 10 years for the firearm enhancements. We agree that the sentence must be vacated and the matter remanded for resentencing.

### A.  Background

Gonzalez waived his right to a jury trial on the aggravating factors alleged in the information concerning the crime. At the sentencing hearing, the prosecutor stated that he believed the defendants had previously admitted the aggravating factors. Counsel for Sebastian disputed this point, but Gonzalez's counsel did not. The court stated: "However, factors in aggravation as to Eric Gonzalez are not relevant." The prosecutor agreed. The court stated that it had considered all circumstances and cited several mitigating factors, including Gonzalez's lack of criminal history and youth. The court did not mention the aggravating factors. It sentenced Gonzalez to 25 years to life plus 10 years for the gun enhancement, or 35 years to life, for counts 1 and 2, respectively, but ordered that the terms be served concurrently based on the mitigating factors.

### B.  The sentence must be vacated and the matter remanded for resentencing

"[A]ny person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by

46

an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense."  (Pen. Code, § 12022.5, subd. (a).)

Under Penal Code section 1170.1, subdivision (d)(2), a trial court may impose the upper term for a sentencing enhancement "only when there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

It is undisputed that the trial court failed to make true findings as to the aggravating factors and therefore erred in imposing the upper term sentence for the firearm enhancements. We remand for resentencing consistent with Penal Code section 1170.1, subdivision (d)(2).  We express no opinion on how the court should exercise its discretion.

[[End nonpublished portion.]]

**DISPOSITION**

Gonzalez's sentence is vacated, and the matter is remanded for resentencing consistent with this opinion.  In all other respects, the judgment is affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION**


ADAMS, J.


We concur:



EDMON, P. J.



EGERTON, J.